608 F.Supp. 1571 (1985)
G.A. IMPORTS, INC., Plaintiff,
v.
SUBARU MID-AMERICA, INC., Defendant.
No. 85-644C(1).
United States District Court, E.D. Missouri, E.D.
May 24, 1985.
Charles Alan Seigel, Andrew F. Puzder and Gordon I. Herzog, Alex M. Kanter, St. Louis, Mo., for plaintiff.
Steven P. Sanders, Kenneth W. Bean, St. Louis, Mo., and Theodore A. Shapero, James A. Flesch, Chicago, Ill., for defendant.

*1572 MEMORANDUM
NANGLE, Chief Judge.
This is a diversity action for declaratory and permanent injunctive relief under the Missouri Motor Vehicle Franchise Practices Act (hereinafter "MVFPA"), Mo.Rev.Stat. §§ 407.810-407.835 (1980). Plaintiff's original complaint also stated claims for unjust enrichment, breach of contract, violation of Mo.Rev.Stat. §§ 407.400-407.420, and an accounting. However, these latter claims were not pressed before this Court and, accordingly, are not considered herein. In addition, the issue of damages was not tried herein. Plaintiff G.A. Imports, Inc. (hereinafter "Imports") is a franchisee of defendant franchisor Subaru Mid-America, Inc. (hereinafter "SMA"). Imports alleged that SMA's attempted non-renewal of its franchise agreement violated the MVFPA.
This case was tried to this Court sitting without a jury. This Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 52.

A. FINDINGS OF FACT
1. Imports is a Missouri corporation with its principal place of business located at 7982 Big Bend Boulevard in St. Louis County, Missouri.
2. SMA is a Delaware corporation with its principal place of business located in Addison, Illinois.
3. Subaru of Mid-America (hereinafter "SOA") imports new Subaru automobiles into the United States and distributes these automobiles to regional distributors, who in turn distribute them to Subaru automobile dealers within their respective regions. SMA is one of SOA's regional distributors and SMA's region includes the States of Missouri, Minnesota, Illinois, North Dakota, South Dakota, Iowa, Wisconsin and Indiana. SMA has eighty-six (86) franchised Subaru dealers, of which Imports is one, in its area of distribution. SMA is a motor vehicle franchisor transacting business with motor vehicle franchisees, including Imports, who maintain places of business within the State of Missouri and with whom SMA has franchise agreements.
4. Imports has operated an automobile dealership in Webster Groves, Missouri, for the sale and service of new and used cars since 1968. Over the years plaintiff has sold, inter alia, Renault, Peugeot, Citroen, Fiat, Lancia and Subaru automobiles. Since 1973, when plaintiff became a Subaru franchisee, plaintiff has principally sold Fiat, Lancia, and Subaru vehicles.
5. In the early 1980's, Fiat and Lancia, which had accounted for the majority of plaintiff's new car sales, determined that they would discontinue new car sales in the United States. Imports' sales of new Fiats and Lancias substantially declined, but during the same period its Subaru sales steadily increased. By 1982, Subaru was Imports' top line. For example, during 1981, Imports sold 67 Fiats and Lancias and only 48 Subarus for a total of 115 new car sales. However, in 1982, Imports sold 30 Fiats and Lancias and 78 Subarus for a total of 108 new car sales and in 1983 sold 27 Fiats and 97 Subarus for a total of 126 new car sales.
6. Since 1973, when Imports first became a Subaru franchisee, SMA has often praised Imports for its general operation and its steady and dramatic increases in Subaru sales and service. SMA has given plaintiff a number of awards for customer satisfaction, customer service, and for Imports' accounting practices. In a letter dated January 27, 1984, SMA stated that Imports had done "an outstanding job in selling Subarus."
7. Until recently, the parties always believed that Imports' location in Webster Groves, Missouri, consisted of 28,500 square feet. However, a recent survey has shown that the actual square footage is 34,685 square feet. In addition, on July 16, 1984, Imports leased a tract of land located at 8154 Manchester Road in Brentwood, Missouri, which consists of 15,300 square *1573 feet. Thus, Imports' total space presently consists of 49,985 square feet.
8. In 1979, Imports was selling Fiat, Subaru and Lancia new automobile lines. On June 13, 1979, Imports entered into a "Subaru Dealership Agreement" with SMA. In addition to a one-page contract, the agreement also consisted of the following preprinted documents: 1) the "Subaru Dealership Agreement and Standard Provisions"; 2) the "Subaru Dealer Operating Standards"; and 3) the "[SOA] Dealership Minimum Standards". Paragraph 5.1 of the Subaru Dealership Agreement and Standard Provisions provided, with respect to facilities, as follows:
All of the facilities identified in the Agreement shall be of sufficient size and satisfactory layout, in reasonable proportion to Dealer's sales volume, with space for expansion in accordance with foreseeable future requirements. Dealer agrees to comply with size, layout, maintenance and appearance standards set forth in the Subaru Dealer Operating Standards Manual and such additional standards established by Distributor consistent with said manual.
Paragraph 9 of the Subaru Dealership Agreement, entitled "Facilities", provided that "distributor has approved the following facilities as the locations for dealer's Subaru operations: ...." Under this section, Imports was to have 3,500 square feet for a Subaru new vehicle sales showroom, 720 square feet for combined sales and office space, 8,250 square feet for its parts and service area, 11,900 square feet of storage space, and 3,400 square feet of used car display and sales space. Thus, paragraph 9 of the Subaru Dealership Agreement required Imports to have a total of only 17,770 square feet. However, the SOA Dealership Minimum Standards were also applicable to Imports. These standards contained the minimum square footage required for stipulated "annual planning potential units  new". Although Imports' planning potential was not contained in the 1979 agreement, the minimum planning potential required a minimum of 43,500 square feet of space.
9. On November 16, 1981, Imports entered into another Subaru Dealership Agreement with SMA. This agreement also consisted of four (4) separate documents: 1) the "Subaru Dealership Agreement"; 2) the "Subaru Dealership Agreement and Standard Provisions"; 3) the "Subaru Dealership National Minimum Standards"; and 4) the "Subaru Dealer National Operating Standards Manual". At the time of entering into this contract, Imports was selling Fiat, Subaru and Lancia new automobiles. Paragraph 5.1 of the Subaru Dealership Agreement and Standard Provisions was different than paragraph 5.1 in the 1979 agreement. Paragraph 5.1 provided, as follows:
Unless otherwise indicated in an addendum to the agreement, all of the facilities identified in paragraph 9 of the agreement are of sufficient size and satisfactory layout, in relation to the marketing guide in effect at the time of execution of the agreement. Changes in marketing guide require compliance by dealer with all applicable size, layout, maintenance and appearance standards set forth in the minimum standards.
Paragraph 9 of the Subaru Dealership Agreement provided, as follows:
Distributor has approved the following facilities, containing the area specified below which dealer will provide and use exclusively for dealer's Subaru operations: ....
Paragraph 9 listed the address of the Webster Groves facility. Paragraph 9 listed the square feet that had to be available for each part of the facility and each item was preceded by the language "exclusive Subaru area". Under paragraph 9, Imports was required to have 1,375 square feet for its showroom, 990 square feet for its sales and general office area, 2,305 square feet for its parts and service area, 6,300 square feet of storage space, and 4,200 square feet of used car display and sales area, for a total of 15,170 square feet. Under this agreement, the "Marketing Guide" was 249 cars per year. With a marketing guide of 249 cars per year, the Subaru Dealership National Minimum Standards required Imports *1574 to have 54,375 square feet. In addition, unlike the SOA Dealership Minimum Standards in the 1979 agreement, the Subaru Dealership National Minimum Standards in the 1981 agreement required Imports to use the designated area "exclusively for Subaru operations."
10. When restrictions on Japanese automobile imports into the United States were imposed on January 1, 1982, a scarcity of new Subaru vehicles was created. As a result, SOA began to allocate new Subarus to its regional distributors who in turn were forced to allocate the automobile to their respective dealers. To allocate new Subarus to its distributors, SOA adopted a "turn and earn" allocation system. SMA adopted a similar system.
Under the turn and earn allocation system, the number of Subarus that an individual SMA dealer receives is determined by the dealer's previous number of retail sales of Subarus and the rate of those sales, i.e., his travel rate. Under the turn and earn allocation system, the more cars a dealer sells to retail buyers and the faster he sells them, when compared to SMA's other dealers, the more cars he will receive from SMA. A dealer who transfers cars to other dealers at wholesale will reduce his future allocations of Subarus because a dealer's travel rate is determined solely by his retail sales. However, the testimony at trial indicated that the turn and earn system is far from a mathematical formula and that even several top officials of SMA have difficulty explaining exactly how the system works.
11. Under the turn and earn system, Imports received 67 Subarus in 1982, 91 Subarus in 1983, and 88 Subarus in 1984. Through March, 1985, Imports received 10 Subarus in 1985.
12. On November 7, 1983, SMA's market development manager, Tim Wright, visited Imports to determine whether Imports complied with SOA's minimum requirements. During said visit, Tim Wright completed a Subaru dealership evaluation worksheet which indicated that Imports did not meet certain of the minimum requirements, including total required land of 43,500 square feet, because its total land was believed to be only 28,500 square feet. Theodor Biewend, owner of Imports, reviewed said evaluation worksheet and signed it.
13. In 1983, Imports had terminated its dealership agreement with Fiat and it had also terminated its dealership agreement with Iveco, a truck line, that it had entered into in 1982. In 1983, Imports was also no longer selling Lancia automobiles. Thus, by the end of 1983, the only new car line being sold by Imports was Subaru.
14. In 1982 and 1983, SMA's share of the total imports sold in the St. Louis market, or market penetration, was SMA's lowest metropolitan area import market penetration in the entire SMA eight (8) state area. SMA's research indicated that exclusive or single line automobile dealers, i.e., dealers who sell a single line make of automobile at a single facility, penetrate the market at a significantly higher rate than dual line dealers. According to SOA, a single line import dealer's market penetration is 45% greater than a dual line import dealer's market penetration. To increase SMA's market penetration, SMA decided to increase the number of single line Subaru dealers. However, whether a dealer is a single or dual line dealer does not enter into SMA's vehicle allocation policies.
15. A new Subaru dealership agreement was entered into between SMA and Imports on January 17, 1984. This agreement consisted of five (5) documents: 1) the "Subaru Dealership Agreement"; 2) an "Addendum A"; 3) the "Subaru Dealership National Minimum Standards"; 4) the "Dealership Agreement and Standard Provisions"; and 5) the "Dealer National Operating Standards Manual". Paragraph 5.1 of the Dealer Agreement and Standard Provisions was identical to that in the 1981 agreement. In addition, the printed language in paragraph 9 of the Subaru Dealership Agreement was identical to that in the 1981 agreement but the typed in information was different. The showroom facility was to be 2,264 square feet, the sales and general office facility was to be 662 *1575 square feet, the parts facility was to be 1,798 square feet, and the service facility was to be 5,622 square feet. Further, the phrase "See Addendum A" was typed in for "Storage Facility" and "Used Car Display and Sales Facility."
Addendum A was entitled "Dealer Operating Standards Addendum". Addendum A essentially consisted of Imports' acknowledgment that its dealership did not meet the minimum standards of SOA and SMA, as well as Imports' agreement to remedy said deficiencies by agreed upon dates. The relevant portion of Addendum A, dealing with land requirements, provided, as follows:
Webster Groves Subaru acknowledges that SMA has informed Webster Groves Subaru that Webster Groves Subaru's existing land is inadequate and fails to comply with the minimum dealership requirements provided in schedule "A" annexed hereto ("land and building requirements"). To upgrade such land, Webster Groves Subaru agrees that:
(a) By no later than June 17, 1984, Webster Groves Subaru shall have given SMA written notice of the location, dimensions and physical description of the total Land, Parking, Display and Storage Areas complying with the Subaru minimum requirements or otherwise accepted by SMA in writing, as well as a description of the terms of Webster Groves Subaru's use of the total Land, Parking, Display and Storage Areas.
(b) In the event the land is to be purchased or leased, by no later than August 17, 1984, Webster Groves Subaru shall deliver to SMA a copy of the sales contract or lease agreement for such purchase or lease.
(c) By no later than November 17, 1984, Webster Groves Subaru shall be operating its dealership with required Subaru total Land, Parking, Display, and Storage Areas exclusively for Subaru operations, unless SMA consents in writing to Webster Groves Subaru's conducting some of such operations from dealer's facility as it presently exists, in order to meet short-term needs of Webster Groves Subaru. Schedule A attached to Addendum A contained a listing of various land and building requirements, which listing was taken from the Subaru dealership national minimum standards.
Like those in the 1981 agreement, the Subaru dealership national minimum standards in the January 17, 1984 agreement required Imports to have 43,500 square feet available "exclusively for Subaru operations". Imports' planning volume under the January 17, 1984 agreement was 113 cars per year.
16. Imports' President, Theodor Biewend, wrote and sent a letter dated January 13, 1984, to SMA in which he stated, as follows:
... I have become a single line Franchised Subaru Dealer. I strive to have a harmonious relationship with the management of SMA and my Subaru customers. We stress building and maintaining good will, selling and servicing under fair policies and courteous practices. It is a two-way street. We must respect and understand each other's responsibilities and needs and work with fairness. As a single line dealer, I depend on Subaru product to prosper and at least meet the dealership's liabilities....
In summary:
1. Promises of receiving increased car allocations when effectively working the Turn And Earn System did not seem to materialize for October, November and December of 1983.
2. The implementation of the Fleet Sales Program seemed to digress from previously announced policy.
3. Single line Subaru dealerships must be supported with adequate product to support the dealership's operations and in addition generate a reasonable return on investment.
For 1984 I have set my goal for 180 new Subaru sales and I hope to be able to count on your support.
17. By leasing 15,300 square feet of property located at 8154 Manchester Road in Brentwood, Missouri, on July 16, 1984, Imports complied with the requirements of *1576 Addendum A to its January 17, 1984 agreement. The annual rent on said property was $600.00.
18. Imports' Webster Groves location has always consisted of 34,685 square feet. Imports' Webster Groves location contains 88 spaces for display, storage and parking of cars. Of these 88 spaces, Imports needs 11 for employee parking, 20 for customer parking and 25 for used cars, thus leaving 31 spaces for the display and storage of new cars, including demonstrators. The Manchester Road property added another 126 spaces to Imports' capacity, which gives Imports a total of 157 spaces available for new car storage and display. However, Imports has never had enough cars to utilize the Manchester Road property and Imports has never had any problems with respect to available space.
19. The show room at Imports' Webster Groves location has always had an area of 2,264 square feet which translates into a new car display capacity of 9 units. In addition, Imports' Webster Groves facility has 953 square feet available for sales and clerical space, 4,924 square feet available for service space, and 1,772 square feet available for parts space.
20. On or about August 24, 1984, Imports signed an agreement with Southland Imports, Inc., to acquire their Peugeot line of new automobiles and sought approval from Peugeot Motors, Inc., to sell new Peugeot automobiles from Imports' Webster Groves facility. On or about October 15, 1984, Peugeot Motors, Inc., executed a Peugeot dealership agreement with Imports and Imports began to display and sell new Peugeots from its Webster Groves facility. The Peugeots were displayed next to the Subarus in Imports' Webster Groves show room.
21. Imports never informed SMA that it was acquiring the Peugeot line prior to said acquisition. SMA only became aware of the sale of new Peugeot automobiles from Imports' Webster Groves facility on October 16, 1984, when Tim Wright, SMA's Market Development Manager, visited Imports on a routine inspection.
22. By letter dated October 19, 1984, SMA advised Imports that it was SMA's intention to exercise its rights under the dealership agreement, including its right not to renew the dealership agreement when it was scheduled to expire on March 31, 1985, if Imports continued to sell new Peugeots or any other line of new vehicles in addition to Subarus from Imports' Webster Groves facility. Specifically, Benson M. DeWitt, President of SMA, stated, as follows:
As you are aware, G.A. Imports, Inc., d/b/a Webster Groves, Inc. and Subaru Mid-America, Inc. entered into a dealership agreement and dealer operating standards addendum on January 17, 1984. Both of these contracts, executed by you, guaranteed that the facility located at 7982 Big Bend Blvd. Webster Groves, Missouri, would be for the exclusive use of the dealership's Subaru operation.
23. In a letter dated November 10, 1984, written by Theodor Biewend on behalf of Imports, Mr. Biewend explained the reasons for taking on the Peugeot line, as follows:
As you are aware, during this past year, the number of units made available and shipped to me have not been sufficient to support my company as a new car dealership. Insufficient available units do not:
1) Justify a well thought out advertising campaign.
2) Permit a harmonious mix of body styles and colors.
3) Permit employment and maintenance of an effective sales staff.
4) Generate a reasonable profit....
At the end of August of this year I had received a number of incoming units allowed to Subaru Mid-America by Subaru of America and it seemed apparent that I would be passed, receiving zero cars for September and October. This conclusion was substantiated by a conversation with your district sales manager. It was, therefore, apparent that I could not exist as a new car dealer as solely dependent on Subaru units. Before concluding that *1577 it was financially imperative to take on another franchise (which, by choice, I would rather not have done), I verified that my closest competitor was not a single line Subaru dealer, as he handles the AMG line.
Having concluded that another line was necessary for my corporate existence, I took on the Peugeot franchise, fundamentally as a line not in direct competition with Subaru.
These statements were essentially denied by SMA in a letter dated November 28, 1984.
24. By letter dated February 13, 1985, SMA informed Imports that the Subaru sales agreement between SMA and Imports would not be renewed following its expiration on March 31, 1985. Imports filed the instant action on March 19, 1985. A stipulation between the parties, approved by this Court, extended the expiration date of Imports' Subaru dealership agreement until the earlier of the date this Court rules on plaintiff's prayer for injunctive relief or June 15, 1985.
25. At the deposition of Benson M. DeWitt, the following exchange took place between counsel for Imports and Mr. DeWitt:
Q. Mr. DeWitt, referring again to the dealership agreement with the plaintiff that's been identified as plaintiff's deposition exhibit 1, under Paragraph Number Nine, you see new vehicle sale show room. Then it has exclusive Subaru area, 2,264.
A. Uh-huh.
Q. And then on the addendum, schedule A-1, said show room for the exclusive use of Subaru, 960 square feet. Which one governs?
A. The one that's identified in that same agreement under the Subaru of America requirement.
26. All of the St. Louis metropolitan area Subaru dealerships are at least dual line dealerships and many carry lines such as Mazda, Volkswagen and Toyota which are competitive with Subaru. New Peugeot automobiles do not compete with new Subaru automobiles.
27. Nothing in Imports' agreement with SMA expressly required it to be a single line dealer. Indeed, Mr. DeWitt testified that SMA had no objection to Imports operating a Peugeot dealership at a facility right next door to Imports' Webster Groves facility. Mr. DeWitt further testified that its only objection was to Imports' use of the space contained in its Webster Groves facility for any line other than Subaru.
28. SMA has approximately ten (10) single line Subaru dealers, each of which sells less than ninety (90) cars per year and meet SOA's minimum requirements, including the total land requirement of 43,500 square feet.
29. During the years prior to 1984 when Imports was at least a dual line dealer, SMA never required Imports to have total land available in the amount of the sum of SMA's land requirements plus the land requirements of the other lines.
30. The 1984 agreement between Imports and SMA was drafted and prepared by SMA and SOA.
31. Imports' Peugeot franchise agreement can be cancelled on thirty (30) days' notice. In addition, Imports' President, Theodor Biewend, has stated that he would either cancel the Peugeot franchise or move the Peugeot automobiles if SMA ever provided Imports with Subarus in sufficient numbers to justify the use of 49,985 square feet. Because Imports receives substantial advance notice of the number of Subarus that it will receive, Imports would have time to move the Peugeots off its premises if it needed to make such space available for Subaru.
32. Mr. DeWitt testified that the purpose of SMA's space requirements was to make sure that a dealership can operate effectively, taking into consideration sales, service and storage needs. There was no evidence that Imports' present available space was inadequate to properly sell, service and store the Subarus it receives from SMA. To the contrary, the evidence established that Imports has a great amount of space that has never been utilized and remains vacant due, in part, to the limited *1578 supply of Subaru automobiles. At times, Imports has not had enough new Subarus to even fill its show room.
33. Under the 1984 franchise agreement, based on Imports' planning volume of 113 units per year, the new vehicle inventory amount which corresponded to the applicable Subaru Dealership national minimum standards with respect to space was 25 units. SMA has never provided Imports with sufficient Subarus to maintain an inventory of 25 cars. During the months of September and November, 1984, Imports received zero automobiles from SMA. In addition, Imports' monthly ending inventory of new cars for the period from August, 1983 through February, 1985, was as follows:

 Month and Year Amount
 8/83 5
 9/83 9
 10/83 9
 12/83 6
 1/84 1
 2/84 4
 3/84 5
 4/84 13
 5/84 12
 6/84 12
 7/84 14
 8/84 11
 9/84 5
 10/84 4
 11/84 2
 12/84 8
 1/85 8
 2/85 9

34. In April, 1984, Imports received 34 new Subaru automobiles. Imports was unable to sell 18 of these cars by the end of April. Imports' President, Theodor Biewend, reasonably believed that he was required to dispose of all of these cars by the end of April and that his future allocations would be decreased if he did not dispose of them by the end of April. Accordingly, he wholesaled the remaining 18 cars to other dealers. He did not realize that by wholesaling these vehicles he would not get credit for a retail sale under the turn and earn system.
35. In 1984, Subaru sales constituted 91% of Imports' new car gross revenue. If SMA is permitted to terminate Imports' Subaru franchise by failing to renew the 1984 Subaru franchise agreement, Imports will be irreparably harmed in that it will be forced to cease business operations. This Court credits the opinion of Imports' accountant that in the absence of the Subaru franchise Imports would be unable to meet its fixed and semi-fixed costs.
36. SMA continues to sell Subaru automobiles in the State of Missouri and does not intend to discontinue such sales.
37. Imports has complied with the terms of the 1984 Subaru franchise agreement and has not defaulted under said agreement.
38. If Imports were required to maintain 43,500 square feet of space exclusively for Subaru to the exclusion of all other car lines, such an obligation would be unreasonable.
39. If Imports were required to maintain 43,500 square feet of space exclusively for Subaru to the exclusion of all other car lines, Imports' failure to comply with such a requirement would not be considered a substantial default under the 1984 Subaru franchise agreement. SMA has suffered no damage as a result of Imports' carrying the Peugeot line of cars.
40. SMA did not prove that it would suffer any significant harm if it is required to renew Imports' franchise agreement.

B. CONCLUSIONS OF LAW
This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1332(c) in that there is diversity of citizenship between Imports and SMA and the amount in controversy exceeds $10,000.00 exclusive of interest and costs. See Findings of Fact Nos. 1, 2.
This is an action by a franchisee against a franchisor under the MVFPA to enjoin said franchisor from failing to renew said franchisee's franchise agreement. The MVFPA is clearly applicable to the case at bar, because Imports is a new motor vehicle franchisee, SMA is a new motor vehicle franchisor, and the agreement between *1579 the two constitutes a franchise as these terms are used in the MVFPA. See Findings of Fact Nos. 3, 4, 15. Mo.Rev. Stat. § 407.815(2), (3), (4), (5), (6) (1980). Section 407.825 of the MVFPA provides, in pertinent part, as follows:
The performance, whether by act or omission, by a motor vehicle franchisor of any or all of the following activities enumerated in this section are hereby defined as unlawful practices, the remedies for which are set forth in § 407.835: (5) To terminate or cancel the franchise or selling agreement of any motor vehicle franchisee except a termination or cancellation made by reason of a substantial default by such franchisee in the performance of such motor vehicle franchisee's reasonable and lawful obligations to such motor vehicle franchisor under the franchise. The non-renewal of a motor vehicle franchise or selling agreement shall constitute an unfair termination or cancellation, regardless of the terms or provisions of such franchise or selling agreement, unless it is not renewed by reason of
(a) A substantial default by such motor vehicle franchisee in the performance of such motor vehicle franchisee's reasonable and lawful obligations to such motor vehicle franchisor under the non-renewed franchise or selling agreement, or
(b) The discontinuance of the sale in the State of Missouri of such motor vehicle franchisor's products which are the subject of the franchise; ....
Mo.Rev.Stat. § 407.825(5) (1980) (emphasis added). Section 407.835 of the MVFPA provides that an unlawful practice as defined in § 407.825 may be remedied in favor of a motor vehicle franchisee by issuing injunctive relief against the motor vehicle franchisor. Mo.Rev.Stat. § 407.835 (1980).
This Court has not located any reported decision, whether state or federal, which purported to apply or interpret the MVFPA. SMA relies on several cases interpreting motor vehicle franchise statutes in other states. See, e.g., Brattleboro Auto Sales v. Subaru of New England, 633 F.2d 649 (2d Cir.1980) (Vermont statute); Scuncio Motors, Inc. v. Subaru of New England, 555 F.Supp. 1121 (D.R.I. 1982) (Rhode Island statute). However, this Court considers these cases to be inapposite, because the statutes applied therein permitted the termination of a motor vehicle franchise agreement merely for "good cause" or if the distributor acted in "good faith". These terms are much less stringent than those used in the Missouri statute. Accordingly, this Court will treat this case on its own merits, as a matter of first impression.
In the opinion of this Court, the purpose of the MVFPA was to create a shift in the balance of power between new motor vehicle franchisors and franchisees. It drastically alters the traditional principles applicable to the enforcement and interpretation of motor vehicle franchise agreements. It displaces express contractual language for notions of substantiality and reasonableness. With respect to non-renewal of a motor vehicle franchise agreement where the franchisor is not discontinuing the sale of its products in Missouri, see Findings of Fact No. 36, the MVFPA effectuates this purpose by prohibiting a non-renewal, "regardless of the terms or provisions of such franchise", unless each of the following questions can be answered in the affirmative:
1) Was there a default by the motor vehicle franchisee under the franchise?;
2) If there was a default, was it with respect to a reasonable obligation to the motor vehicle franchisor?; and
3) If there was a default in the performance of a reasonable obligation, was said default substantial?
This Court will consider the answer to these questions in the case at bar seriatim.

1. Default
It is the opinion of this Court that Imports did not violate its franchise agreement with SMA by taking on the Peugeot line. See Findings of Fact No. 37. Nowhere in the franchise agreement did Imports expressly and unambiguously promise *1580 to remain a single line dealer. See Findings of Fact No. 27. In fact, Mr. DeWitt himself testified that SMA had no objection to Imports selling Peugeots on property next door to Imports' present Webster Groves facility. Id. However, SMA argues that the franchise agreement requires Imports to be a single line dealer, because the agreement states that 43,500 square feet of space must be devoted exclusively to selling, servicing and storing Subarus. See Findings of Fact No. 15. In the opinion of this Court, the agreement is ambiguous at best with respect to space and is probably incomprehensible. The agreement consists of a conglomeration of pre-printed forms, partially pre-printed and partially typed forms, and completely typed forms. Space requirements are referred to in no less than four (4) separate parts of the agreement. Paragraph 5.1 of the dealership agreement and standard provisions suggests that any addendum is controlling over anything contained in paragraph 9 of the dealership agreement. Even Mr. DeWitt expressed some confusion as to which document controls with respect to the space requirements. See Findings of Fact No. 25. In fact, his deposition answers suggest that Imports need only provide Subaru with exclusive use of 960 square feet of its show room. Id. A contract that is open to more than one interpretation will be construed against the party that prepared it. Empire Gas Corp. v. Small's LP Gas Co., 637 S.W.2d 239, 247 (Mo.Ct.App. 1982). Under these circumstances, the agreement must be construed as not prohibiting Imports from carrying more than one line of new automobiles at its Webster Groves facility.
Even if this Court were to conclude that the applicable contract terms required Imports to devote 43,500 square feet to the exclusive use of Subaru, it is clear that the parties never intended the term "exclusive" to be interpreted literally. For example, under the 1981 agreement Imports was required to devote 54,375 square feet "exclusively" to Subaru operations. See Findings of Fact No. 9. Nevertheless, the parties always believed that Imports' Webster Groves facility consisted of 28,500 square feet. See Findings of Fact No. 7. Moreover, Imports was a dual line dealer while the 1981 agreement was in effect. See Findings of Fact No. 9. Thus, the parties' course of performance suggests that something other than a literal interpretation of "exclusive" was intended. Because the purpose of the space requirements in the Subaru franchise agreement was to insure that there was adequate space to accommodate the sales, service, and storage needs of the dealer, see Findings of Fact No. 32, the exclusivity aspect of the space provisions of the contract must be construed in accordance with this purpose. Indeed, the minimum space requirements are tied directly to a dealer's planning volume and inventory figures. See Findings of Facts Nos. 9, 33. In the opinion of this Court, the parties intended that the exclusivity aspect of the space requirements be relaxed when, if ever, SMA was unable to distribute vehicles in the quantities anticipated in the agreement. Thus, Imports need only have "available" sufficient space to satisfy the requirements of the contract and is not prevented from otherwise utilizing said space when Subaru vehicles are not supplied in sufficient quantities to fully utilize said space. The parties' contract should be given a construction that yields fair, reasonable and practical consequences. Tureman v. Altman, 239 S.W.2d 304 (Mo. banc 1951).
As for SMA's argument that Imports' facilities do not meet the applicable space requirements because Subaru's space requirements must be added to Peugeot's space requirements, this interpretation of the agreement is not supported by the parties' course of performance. See Findings of Fact No. 29.
Accordingly, this Court concludes that the first question must be answered in the negative. Imports did not violate the franchise agreement by taking on the Peugeot line because, alternatively: 1) the agreement did not expressly prohibit taking on another line and the agreement is so ambiguous with respect to the applicable space requirements that it should be construed against SMA; or 2) the parties' *1581 course of performance requires that the exclusivity aspect of the space requirements be interpreted in a reasonable and fair manner so that Imports is not required to underutilize its facilities when Subaru automobiles are not available in sufficient quantities.

2. Reasonableness
The second question must also be answered in the negative. In the opinion of this Court, the requirement that Imports use its available facilities exclusively for Subaru products is unreasonable, given the limited supply of Subaru automobiles. See Findings of Fact No. 38. It is unreasonable for SMA to require Imports to hold 157 spaces out for Subaru products when the highest monthly ending inventory during 1984 was 14 cars and at times Imports did not have enough Subarus to fill its show room. See Findings of Fact Nos. 32, 33. Such a requirement has no reasonable relation to the needs of Imports' business or its customers. SMA's only serious justification for this requirement is its belief that market penetration can be increased by requiring Imports to remain a single line dealer. See Findings of Fact No. 14. This justification is problematic for several reasons. First, SMA does not treat single line dealers any differently than dual line dealers with respect to distribution under the turn and earn system. See Findings of Fact No. 14. Second, given a limited supply of Subaru automobiles, Imports is placed in a disadvantageous position with respect to its competitors, all of whom are at least dual line dealers and who have other lines to subsidize their overhead. See Findings of Fact No. 26. Third, the goal of increased market penetration is not likely to be achieved when SMA does not even provide Imports with enough cars to meet the planning volume or inventory stipulated under the franchise agreement and in fact provided Imports with fewer cars in 1984 as a single line dealer than it did as a dual line dealer in 1983. See Findings of Fact Nos. 11, 15, 33. This Court credits Imports' offer that it will either move the Peugeots or cancel the Peugeot agreement if it ever receives Subarus in sufficient numbers to utilize its available space. See Findings of Fact No. 31. Under these circumstances, the exclusivity requirement is unreasonable and, thus, the second question must be answered in the negative.

3. Substantiality
Finally, this Court holds that, assuming Imports is violating a reasonable provision of the franchise agreement by carrying the Peugeot line at its Webster Groves facility, said violation does not constitute a substantial default under the agreement. See Findings of Fact No. 39. "Substantial" is not defined under the MVFPA, but it is the opinion of this Court that said term focuses on the impact on the franchisor of the franchisee's violation. In the case at bar, there has been no showing that there will be any detrimental effect on SMA's business if Imports is allowed to maintain its Peugeot line. See Findings of Fact No. 39. According to SMA, only 10 of its 86 franchisees are single line dealers. See Findings of Fact No. 28. There was no evidence that if Imports is allowed to carry the Peugeot line, all of SMA's single line dealers will violate their obligation to remain single line dealers, if such an obligation exists. There was also no showing that SMA will be able to sell fewer cars to Imports, if Imports operates as a dual line dealer. Moreover, Peugeot automobiles are not competitive with Subaru automobiles. See Findings of Fact No. 26. Finally, the fact in prior years that Imports' facility was 15,000 square feet less than the applicable minimum standards required and SMA did not object to Imports carrying other lines, further suggests that Imports' violation, if any, is not substantial. See Findings of Fact Nos. 4, 7, 8, 9.
Accordingly, it is the opinion of this Court that SMA's contemplated nonrenewal of the franchise agreement violates the MVFPA. Imports is entitled to permanent injunctive relief, because it would suffer irreparable harm if the Subaru franchise were lost. See Findings of Fact No. 35. See Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir.1970), quoted in ABA Distributors, Inc. v. Adolph Coors Co., 661 F.2d 712, 714 (8th Cir.1981). *1582 Injunctive relief will not require this Court to supervise the day-to-day operation of this dealership or to write a new contract for the parties. SMA did not prove that it would suffer any significant harm if it is required to renew Imports' 1984 franchise agreement. See Findings of Fact No. 40. The risk of SMA being held in default by SOA is not great given the fact that Imports' facilities did not meet SOA's minimum standards prior to August, 1984, and there was no evidence that SOA took any adverse action against SMA. SMA is ordered to renew Imports' franchise agreement and not to terminate said franchise due to Imports' carrying of the Peugeot line.

ORDER
Pursuant to the Memorandum filed herein this day,
IT IS HEREBY ORDERED that defendant be and is permanently enjoined from failing to renew the franchise agreement between defendant and plaintiff due to plaintiff's carrying of the Peugeot line of automobiles.
IT IS FURTHER ORDERED that plaintiff shall advise this Court, in writing and within five (5) days of this date, of the extent to which the Order and Memorandum entered herein disposes of plaintiff's complaint. If defendant wishes to respond thereto, it shall do so within five (5) days of receipt of same.