**PROPERTY TAX RESEARCH COMPANY, Appellee,**

v.

**FALSTAFF BREWING CORPORATION, Appellant.**

No. 82–1662.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1983.

Decided June 7, 1983.

Rehearing Denied July 19, 1983.

**1334**

Steven P. Sanders, Shepherd, Sandberg & Phoenix, P.C., St. Louis, Mo., for appellant.

Donald L. Schlapprizzi and Margaret M. Neill, St. Louis, Mo., for appellee.

Before BRIGHT, ARNOLD and JOHN R. GIBSON, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Property Tax Research Company (PTR) contracted with Falstaff Brewing Corporation to attempt to reduce Falstaff's assessed valuation on its New Orleans brewery. The assessed valuation was reduced. Falstaff refused to pay PTR. This action resulted, and a jury awarded PTR $78,539.07.[1] Falstaff appeals, contending (1) that there was insufficient evidence to support the size of the verdict rendered against it, (2) that it was improperly prevented from introducing evidence of its intent in contracting with PTR, and (3) that the court's verdict directing instruction was in error. We affirm.

In December 1978 or January 1979 Falstaff closed its brewery in New Orleans. Despite the closing, the 1979 property tax bill which Falstaff received on its New Orleans property was higher than the 1978 bill. On June 6, 1979, Falstaff's in-house attorney, James Cabanski, wrote a letter of protest to the New Orleans assessor, contending that the taxes on Falstaff's New Orleans property should be lowered since the brewery was no longer in use. On June 22, 1979, Cabanski wrote to Joseph Sansone, owner of PTR, with whom Falstaff had had earlier dealings with respect to reduction of Falstaff's assessments, and expressed interest in having PTR represent Falstaff in regard to the problems in New Orleans. On June 26, 1979, Sansone for PTR sent a form letter to Cabanski outlining a proposal[2] to

---

1. The Honorable H. Kenneth Wangelin, United States District Judge for the Eastern District of Missouri presiding.

2. The proposal contained the following language:

Property Tax Research Company proposes to research, examine and evaluate the property located at 2601 Gravier Street, New Orleans, Louisiana, to determine whether the assessed valuation used by the taxing author-

ities for the year 1979 is excessive and, in such event, it would be the responsibility of Property Tax Research to attempt to have the assessed valuation reduced.

Should Property Tax Research be successful in this endeavor, and thus effect a reduction in taxes, [Falstaff] would then pay to Property Tax Research a *fee of 50 percent of the first two years tax savings* . . . .

attempt to reduce the assessed valuation of Falstaff's property in New Orleans. Under the terms of the agreement, if PTR were successful "and thus effect[ed] a reduction in taxes," then Falstaff would pay PTR fifty percent of the first two year's tax savings. The President of Falstaff, Paul Kalmanovitz, signed the proposal June 28, 1979, and returned it to PTR.

After the execution of the contract Joseph Sansone traveled to New Orleans and met with Falstaff employees to discuss the condition of the property. He inspected the closed brewery and sent pictures of it to the New Orleans Assessor as evidence that the property was no longer in use. He also met with the Assessor, Lawrence Comiskey, and discussed the proper valuation of Falstaff's property.

Comiskey testified by deposition that he had not devalued the Falstaff property for 1979 because there were rumors that the plant would be reopening. He stated that if a company told him they were going to close, he would not automatically lower their property valuation because "I got burned on that a couple of times.... It's easier to take them off the tax rolls than to get them back on the tax rolls." He also testified that he took no steps prior to the meeting with Sansone to reduce the assessment. Comiskey further testified that Sansone was very persistent in attempting to get the assessment reduced, stating "he pressured me to reduce it, cancel it ... and I said I can't do it basically because I understood they were going to reopen it. Finally, I got it that they were not going to reopen, and officially, absolutely it was closed down."

Sansone later made a second trip to New Orleans, meeting with personnel from both the Collector's Office and the Assessor's Office in an attempt to straighten out problems with the tax bills Falstaff had received. Sansone testified that he and his employees made approximately 100 phone calls to New Orleans in connection with the Falstaff property.

It was stipulated that Falstaff's New Orleans real estate assessment was reduced from $284,100 in 1979 to $100,000 in 1979, and to $197,100 in 1980. The personal property tax assessment was reduced from $753,140 in 1978 to $100,000 in 1979, and to $3,220 in 1980. These reductions resulted in an annual tax savings for Falstaff of $78,539.07 for the years 1979–80.

PTR submitted a bill to Falstaff for $78,539.07, or 50% of the total tax savings for 1979–80. Falstaff refused to pay the bill, contending that the tax reduction had not been due entirely to the efforts of PTR. This action followed.

I. Sufficiency of Evidence to Support the Amount of the Verdict

Falstaff argues that a substantial reduction in taxes was a "foregone conclusion" once the brewery was closed, and that PTR should not have been allowed to recover a fee for those portions of the tax reduction which would have accrued automatically whether PTR had been retained or not. Falstaff argues that there is insufficient evidence to support any award of damages, and further that there is insufficient evidence with respect to the amount of damages found. We conclude that there was sufficient evidence from which the jury could conclude that PTR had effected the tax reduction and was thus entitled to the fee it sought, $78,538.07.

The testimony as to whether there would have been an "automatic" reduction was conflicting. Sansone and Comiskey both testified that there were no automatic reductions, although Comiskey also stated, somewhat inconsistently, that the reduction was a "foregone conclusion". This was an issue for the jury to determine. Comiskey testified that Sansone had pressured him to cancel and reduce the taxes on the brewery property, that Sansone had convinced him that the taxes should be reduced because the brewery was not going to reopen, and that after discussing the matter with Sansone he had agreed that they should be reduced to a certain figure.

Falstaff contends that the following question and answer support its position

that the tax reduction would have been automatic even in the absence of PTR's efforts:

Q. (To Comiskey) Would you say it's a fair statement that you would have reduced the assessment because it was closed even if Mr. Sansone would have come here or not?

A. When they were definitely closing it would have been reduced.

The critical words in the answer, however, are "when they were definitely closing." Assessor Comiskey was unwilling to reduce the assessed valuation of the property until he was convinced that the brewery was finally and absolutely closed. He did not intend to reduce the taxes on the closed brewery property for the years 1979 to 1980 because rumors were circulating that it would be reopened. Viewed most favorably to plaintiff, the evidence established that Falstaff had not persuaded Comiskey that the brewery was in fact going to be permanently closed, and therefore the taxes had not been reduced. Sansone, however, accomplished what Falstaff had not: He convinced Comiskey to reduce the valuation, and he "effected" a reduction in Falstaff's property taxes. The contract called for PTR to attempt to have the assessed valuation reduced. Its efforts to persuade the assessor were the endeavors involved to "effect" the tax reduction.

Much of the evidence introduced by Falstaff, and much of Falstaff's closing argument, was devoted to showing that PTR exerted relatively little effort to reduce the taxes on the New Orleans property. The contract did not provide, however, that PTR was to be paid on the basis of the amount of effort it put out, but rather on the results achieved. The evidence here was sufficient to support a finding that PTR, whatever amount of effort it exerted, did convince Assessor Comiskey to reduce the valuation of the Falstaff property in New

Orleans. The fact that Falstaff's expert witness testified that he would ordinarily have spent $6,000 to $7,000 hiring an appraiser, putting together written reports and otherwise working on effecting a reduction of the size of that effected in New Orleans does not conclusively establish that Sansone's lesser efforts could not have had the same effect. The issue was one for the jury to decide.

## II. Evidentiary Rulings

■ The written contract provided that Falstaff was to pay PTR fifty percent of all tax reductions effected by PTR. Falstaff sought to introduce testimony of its attorney, Cabanski, that Falstaff's officers believed this contract was intended to apply only to reductions beyond the "automatic" reduction which Falstaff contended was going to come about simply from the closing of the brewery.

We conclude that the trial court correctly refused to admit this testimony. There is no language in the contract itself about an automatic reduction.[3] Evidence on this issue would have served to vary the unambiguous terms of an integrated written document. This would have violated the Missouri parol evidence rule, which provides that "evidence of understandings and negotiations concerning a written instrument is inadmissible to vary, alter, or contradict" the terms of a written instrument which is complete, unambiguous and otherwise valid. *Sullivan v. United States*, 363 F.2d 724, 727, (8th Cir.), *cert. denied*, 387 U.S. 905, 87 S.Ct. 1683, 18 L.Ed.2d 622 (1966).[4]

■ Falstaff contends that the contract in this case was ambiguous. We disagree. Under Missouri law a contract is ambiguous if it is "reasonably susceptible of more than one construction," giving the words of the contract their plain and ordinary meaning as understood by reasonable persons. *Uni-*

---

**3.** In one of the earlier transactions between PTR and Falstaff, there had been specific provision for payment of a fee only for reductions in excess of a certain specified amount. There was not such provision in this contract between the parties.

**4.** Under Missouri law the parol evidence rule is a rule of substantive law and not a rule of evidence. *Pinken v. Frank*, 704 F.2d 1019 (8th Cir.1983); *Roberts v. Browning*, 610 F.2d 528 (8th Cir.1979).

versal Towing Co. v. United Barge Co., 579 F.2d 1098, 1101 (8th Cir.1978); *Harris v. Union Electric Co.*, 622 S.W.2d 239 (Mo.App. 1981). In this case the words were susceptible of only one interpretation—that PTR was to receive 50 percent of all tax reductions which it effected. To allow Falstaff to introduce evidence that the contract was intended to deal only with reductions below a certain amount would have materially altered the written contract, and in essence would have varied its terms by adding an additional limitation. Parol evidence cannot be used "to read into the contract something which it does not say." *Craig v. Jo B. Gardner, Inc.*, 586 S.W.2d 316, 324 (Mo. en banc 1979).

### III. Verdict Directing Instruction

■ Falstaff argues that the verdict directing instruction erroneously informed the jury that if PTR effected any reduction in taxes, then it was entitled to a fee based on the entire tax reduction, whether or not its own efforts had brought about the whole reduction.[5] The contract between PTR and Falstaff was a "results" rather than an "efforts" contract, and unambiguously stated that PTR would receive a 50 percent fee based on the amount of the tax reduction PTR effected. The instruction submitting plaintiff's theory of the case contained an accurate paraphrase of the contract language. The court also gave a converse instruction offered by Falstaff that required a verdict for defendant unless the jury believed "defendant agreed to pay plaintiff for a period of two years one-half of the tax savings to defendant brought about by plaintiff's *services*." [Emphasis added.] The instructions must be read together. The converse instruction completely answers Falstaff's argument.

Similarly, Falstaff argues that the instruction allowed the jury to award PTR damages for the value of the service it rendered rather than for the results achieved. Again, the converse instruction, not only in the passage quoted above but on one other occasion, refers to "services". The verdict directing instruction paraphrased the contract language in the first two paragraphs. The reference to services dealt only with the question of breach and failure to make payment and not with the duties imposed upon PTR by the contract.

The court's instructions informed the jury that they were to award damages that would fairly and justly compensate plaintiff for damages sustained as a direct result of the breach of contract. The district judge has broad discretion in framing the charge to the jury. *Board of Water Works Trustees v. Alvord, Burdick & Howson*, 706 F.2d 820 (8th Cir.1983). Reading the instructions together, we conclude that the entire charge fairly and adequately contained the law applicable to the case. *Id.* at 823.

In their closing arguments both PTR and Falstaff argued that PTR was to receive a fee based only on the amount of tax reduction which had brought about by its efforts. When read in this context, the verdict directing instruction given to the jury was not misleading and did not misstate the provisions of the contract. "Jury instructions must be viewed in their entireties and verdicts will not be overturned by picking and choosing words from an instruction without regard to the realities of the trial." *E.I. du Pont de Nemours & Co. v. Berkley & Co., Inc.*, 620 F.2d 1247, 1270 (8th Cir. 1980).

---

**5.** The verdict directing instruction as given read:

"Your verdict must be for the plaintiff if you believe

first, plaintiff and defendant entered into an agreement whereby plaintiff agreed to attempt to obtain a reduction in the assessed valuation of defendant's real and personal properties located in New Orleans, Louisiana, in order to secure a tax savings for defendant and defendant agreed to pay a contingent fee

of 50 percent of the first two years of tax savings.

And second, that the plaintiff was successful in effecting a reduction in the assessed valuations at a tax savings for the defendant, and thereby performed their agreement.

And third, that the defendant failed to pay the plaintiff for their services and thereby failed to perform its agreement.

And fourth, plaintiff was thereby damaged."

Having carefully examined the arguments advanced by Falstaff, we find no error and the judgment of the district court is affirmed.

Affirmed.