**G.A. IMPORTS, INC., Appellee,**

v.

**SUBARU MID–AMERICA, INC., Appellant.**

No. 85–1772.

United States Court of Appeals, Eighth Circuit.

Submitted April 17, 1986.

Decided Aug. 27, 1986.

**1202**

Marc P. Seidler, Chicago, Ill., for appellant.

Andrew F. Puzder, St. Louis, Mo., for appellee.

Before JOHN R. GIBSON, Circuit Judge, BRIGHT, Senior Circuit Judge, and FAGG, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

The Missouri Motor Vehicle Franchise Practices Act (Franchise Act), Mo.Rev.Stat. §§ 407.810–.835 (V.A.M.S.Supp.1986), bars a franchisor from nonrenewal of a new motor vehicle franchise unless the franchisee is in "substantial default" of "reasonable and lawful obligations" to the franchisor. *Id.* § 407.825(5). Subaru Mid-America (Mid-America), a regional distributor of Subaru automobiles, threatened non-renewal of a franchise held by G.A. Imports (Imports), a Subaru dealer, because Imports had become a dual-line dealer, selling Peugeot automobiles in addition to Subaru, which Mid-America claimed constituted a default of Imports' obligation to deal exclusively in Subaru. The district court[1] held that Imports' dual-line dealing did not create a default because its contract with Mid-America did not bind it to sell exclusively Subaru. The court further held that even if Imports were in default, the default was not substantial because there was no showing that Imports' dual-line dealing would detrimentally affect Mid-America's business. The district court also held that even if Imports had committed substantial default, the purported contractual obligation permitting it to sell only Subaru was unreasonable because Mid-America failed to supply sufficient Subaru vehicles to allow Imports to stay in business, the Peugeot line did not compete with Subaru, and Imports agreed to discontinue sales of Peugeot upon 30 days' notice that it would receive sufficient Subaru stock. Therefore, pursuant to its authority under the Franchise Act, the district court permanently enjoined Mid-America from not renewing Imports' Subaru franchise due to Imports sale of Peugeot. *G.A. Imports, Inc. v. Subaru Mid-America,* 608 F.Supp. 1571 (E.D.Mo.1985). Mid-America seeks to reverse the grant of injunctive relief, contending that the district court misinterpreted the franchise agreement and misconstrued the Franchise Act's substantiality and reasonableness requirements. We affirm.

**I.**

Imports has operated an automobile dealership in Webster Groves, Missouri, near St. Louis, since 1968. Mid-America, one of 13 regional distributors of new Subaru automobiles for Subaru of America, the importer, distributes Subaru automobiles within an eight-state region including Missouri, and currently distributes to 86 dealers. In 1973, Imports contracted with Mid-America to become a Subaru franchisee. The franchise agreement has been renewed with alterations several times since. The January 1984 Agreement, at issue in this

---

1. The Honorable John F. Nangle, Chief Judge, United States District Court for the Eastern District of Missouri.

case, which incorporates parts of earlier agreements, was to govern for one year. Because the district court enjoined Mid-America from not renewing Imports' franchise, the parties continue to do business under the January 1984 Agreement.

Imports, like all other St. Louis area Subaru dealers, has virtually always carried more than one manufacturer's line. Throughout the 1970s, Imports principally sold Fiat and Lancia, in addition to Subaru. In the early 1980s, Fiat and Lancia phased out new car sales in the United States. While Imports continued to carry those lines, by 1982 Subaru was Imports' top line; by 1984, Imports sold only Subaru. In deciding not to replace the Fiat and Lancia lines and to concentrate on Subaru sales, Imports seems to have been influenced by Mid-America, which had concluded that single-line dealerships achieve a 45% greater market penetration than multi-line dealerships. Throughout this period, all other St. Louis area Subaru dealers maintained sales of other lines, including Mazda, Volkswagen, and Toyota, which the district court found compete directly with Subaru.

Imports' planning volume, acknowledged in the January 1984 Agreement, was 113 Subaru vehicles per year. With such a planned sales volume, Imports was required, under Subaru of America's national minimum standards, incorporated into the Agreement, to maintain a monthly ending inventory of 17 vehicles. In 1982 the Japanese government limited its manufacturers' exportation of new cars to the United States, and a scarcity of Subaru vehicles developed. In response, Mid-America instituted a "turn and earn" vehicle rationing system, under which the number of new Subarus a dealer obtained was pegged to its retail sales rate relative to that of other Subaru dealers. Despite turn and earn, Imports was unable to obtain sufficient inventory to support its planned sales volume. Thus, after selling more Subarus in 1983 than it had received, and despite its planning volume of 113 for 1984, Imports received only 88 Subaru vehicles in that year. During the first three months of 1985, Imports received only 10 Subaru vehicles. Moreover, throughout 1984 and 1985, Imports monthly ending inventory of Subaru automobiles never exceeded 14, and its inventory usually was lower.

Faced with the continuing prospect of insufficient Subaru inventory, on October 15, 1984, Imports, without notifying Mid-America, obtained a franchise to sell Peugeot automobiles from its Webster Groves facility. The agreement with Peugeot allowed Imports to terminate that franchise upon 30 days' notice. Mid-America learned of Imports' Peugeot sales the following day, and on October 19, 1984, wrote Imports that it would not renew the January 1984 Agreement if Imports continued to sell Peugeot. Mid-America stated that its prospective nonrenewal was based on Imports' violation of the January 1984 Agreement, which Mid-America asserted required Imports to devote the entire Webster Groves facility exclusively to the sale of Subaru.

The district court found that the January 1984 Agreement did not explicitly bind Imports to maintain a single-line Subaru dealership. Rather, the assertions of exclusivity arose from requirements concerning the space Imports was to devote to Subaru sales referenced in four separate places in the January 1984 Agreement, which consisted of five separate documents. Paragraph 9 of one of the documents, entitled "Dealership Agreement," required Imports to commit 2,264 square feet of showroom space, which constituted its entire showroom, to the display of Subaru. Another document, "Schedule A," attached to "Addendum A," required Imports to devote 960 square feet of its showroom, the minimum under Subaru of America's national minimum standards, exclusively to the display of Subaru. Paragraph 5.1 of still another document, entitled "Dealership Agreement and Standard Provisions," indicated that the space requirements in any addendum to the Agreement—in this case Schedule A—would supersede those in the Dealership Agreement. Schedule A also required Imports to maintain 43,500 square feet, anoth-

er Subaru of America minimum standard, which constituted most of its 49,685 total square feet, exclusively for Subaru. The 1981 Agreement required that Imports maintain 54,375 square feet exclusively for Subaru; at that time Imports' facility consisted of only 34,685 square feet.

The district court, unable to reconcile the 2,264 square foot showroom space requirement in Paragraph 9 and the 960 square foot showroom space requirement in Schedule A, reasoned that the January 1984 Agreement was ambiguous in this respect, and thus would be construed against Mid-America, the drafter. It therefore concluded that the January 1984 Agreement did not require Imports to devote its entire showroom space to Subaru. The court further concluded that as Mid-America had never enforced the total square foot exclusivity requirement, 54,375 in the 1981 Agreement, and 43,500 in the January 1984 Agreement, which it found was established to ensure the availability of adequate space to sell, service, and store the Subaru line, the parties' course of dealing throughout their relationship and the purpose of the space requirement indicated that the January 1984 Agreement must be read to require Imports to maintain the total space for Subaru only if Mid-America supplied Imports with sufficient inventory. The court thus held that by committing part of its facility to the sale of Peugeot, Imports had not defaulted on any obligation to Mid-America under the January 1984 Agreement.

The district court further held that even if Imports had defaulted, the default did not constitute a "substantial default" within the meaning of the Franchise Act. To prove the default substantial, the court reasoned, Mid-America was required to show that Imports' sales of Peugeot from its Webster Groves facility would detrimentally affect Mid-America's business. The court found that Mid-America failed to show that its sales would slip or that other dealers obligated to sell exclusively Subaru, allegedly 10 of the 86, would violate their single-line obligations should Imports maintain the Peugeot line.

The court also held that were Imports obligated to maintain a single-line Subaru dealership, the requirement under these circumstances was not "reasonable" within the meaning of the Franchise Act. The court recognized that Mid-America's interest in seeking to achieve increased market penetration through the maintenance of single-line dealerships, while legitimate, would unlikely be realized as long as Mid-America failed to supply Imports with sufficient vehicles. Imposition of a single-line obligation on Imports, the court found, placed the dealer at a competitive disadvantage to the other St. Louis area Subaru dealers, all of which were able to subsidize their fixed costs through the sale of lines in addition to, and indeed competitive with, Subaru. The court also found it unreasonable to require Imports to keep its Webster Groves facility half-empty, threatening the viability of Imports' business, merely to satisfy Mid-America's interest in maintaining single-line dealerships. This was especially so, the court concluded, since Peugeot did not compete with Subaru, and in light of Imports' willingness to discontinue sales of Peugeot from its Webster Grovers location, should Mid-America provide sufficient vehicles.

Having concluded that Imports was not in default of the January 1984 Agreement, that even if it were in default, its default was not substantial, and that at any rate, any obligation to devote the entire Webster Groves facility or the entire showroom exclusively to the sale of Subaru was unreasonable, the district court, pursuant to its authority under the Franchise Act, permanently enjoined Mid-America from not renewing Imports' Subaru franchise due to Imports' sale of Peugeot. This appeal followed.

## II.

The Franchise Act provides:

The non-renewal of a motor vehicle franchise or selling agreement shall constitute an unfair termination or cancellation, regardless of the terms or provi-

sions of such franchise or selling agreement, unless it is not renewed by reason of * * * a *substantial default* by such motor vehicle franchisee in the performance of such motor vehicle franchisee's *reasonable and lawful obligations* to such motor vehicle franchisor under the non-renewed franchise or selling agreement * * *.

Mo.Rev.Stat. § 407.825(5) (emphasis supplied). The Franchise Act further provides:

Any motor vehicle franchisee may bring an action against a motor vehicle franchisor with whom he has a franchise, for an act or omission which constitutes an unlawful practice as defined in section 407.825 to recover damages sustained by reason thereof, and, where appropriate, such motor vehicle franchisee shall be entitled to injunctive relief * * *.

*Id.* § 407.835. Thus, nonrenewal of a new motor vehicle franchise violates the Franchise Act unless the court concludes that the franchisee was in default of provisions of the franchise agreement, the default was substantial, and the provisions defaulted upon were reasonable. A negative conclusion as to any step in this inquiry gives rise to a violation of the Franchise Act, and allows the court to enjoin the franchisor from non-renewal. In this case the district court held that Mid-America failed to satisfy any of the three grounds.

In determining whether in this diversity action any aspect of the Franchise Act was violated by the threatened nonrenewal, we give great weight to the district court's interpretation of state law. *See Northern States Power Co. v. ITT Meyer Industries,* 777 F.2d 405, 413 (8th Cir.1985); *Shidler v. All American Life & Financial Corp.,* 775 F.2d 917, 920 (8th Cir.1985). Our deference is especially substantial when considering a state statute not yet construed by the state court, as is the case here. *See Mason v. Ford Motor Co.,* 755 F.2d 120, 122 (8th Cir.1985); *Kansas State Bank v. Citizens Bank,* 737 F.2d 1490, 1496 (8th Cir.1984). As to the district court's findings of fact, we of course cannot set them aside unless clearly erroneous. Fed.R.Civ.P. 52(a); *see*

*also Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

### III.

Mid-America challenges the district court's conclusion that the January 1984 Agreement is ambiguous. Mid-America contends that the space requirements in the Dealership Agreement control and are not contradicted by those in Schedule A, that the parties' course of performance under the January 1984 Agreement demonstrates a mutual intent that Imports maintain a single-line Subaru dealership, and that their course of dealing under the 1981 Agreement is irrelevant. Mid-America thus argues that the January 1984 Agreement unambiguously requires Imports to maintain a single-line Subaru dealership, and that Imports' sale of Peugeot from its Webster Groves facility constitutes a default.

Our aim in construing a contract is to determine the parties' intent. *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club,* 491 S.W.2d 261, 264 (Mo.1973). We begin this inquiry with the language of the contract itself. *See Press Machinery Corp. v. Smith R.P.M. Corp.,* 727 F.2d 781, 784 (8th Cir.1984) (applying Missouri law). We observe at the outset, as the district court properly found, that nothing in the January 1984 Agreement expressly requires Imports to maintain a single-line dealership. Mid-America tacitly concedes as much, and argues instead that the exclusivity obligation arises from Paragraph 9 of the Dealership Agreement, in which Imports purportedly agreed to devote 2,264 square feet of its showroom, its entire showroom space, exclusively to display of Subaru. Mid-America argues that Schedule A, which requires Imports to devote 960 square feet of its showroom to Subaru display, does not conflict with the requirement of Paragraph 9. Schedule A, it asserts, merely states Subaru of America's national minimum standard; by Paragraph 9, Imports agreed to exceed that standard and commit its entire showroom to Subaru.

We reject this explanation. Nowhere does Schedule A suggest itself to be anything other than an agreement on space requirements between Mid-America and Imports. There is no suggestion that it states the national minimum standard. Its requirements therefore directly clash with those in Paragraph 9. Moreover, whatever light Mid-America's explanation sheds is dissipated by Paragraph 5.1 of the Dealership Agreement and Standard Provisions, which states that "the facilities identified in Paragraph 9 of the Agreement are * * * of sufficient size," "[u]nless otherwise stated in an addendum to the Agreement." While we are not prepared to say that Paragraph 5.1 shows unequivocally that Schedule A rules, we can conclude with certainty, as did the district court, that the contract on its face allows us certainty of nothing.

■ Nor does the parties' course of performance under the January 1984 Agreement plainly demonstrate a mutual intent regarding the space requirements which would clarify the Agreement's facial ambiguity. *See* Mo.Rev.Stat. § 400.2–208(1) (parties' actions under the agreement relevant to determine meaning of agreement); *see also Shell v. Shell,* 658 S.W.2d 439, 444 (Mo.Ct.App.1982) (the practical construction the parties themselves place on an agreement is probative of its meaning). To demonstrate that the parties understood the January 1984 Agreement to require Imports to sell exclusively Subaru, Mid-America relies on letters from Imports to Mid-America, written both before the January 1984 Agreement was executed, and after Mid-America informed Imports that the franchise would not be renewed, in which Imports expressed its desire to become a single-line Subaru dealer. Mid-America also argues that Imports' promise to discontinue the Peugeot franchise should Mid-America supply sufficient vehicles also demonstrates Imports' understanding that it was required to deal exclusively in Subaru. These letters and testimony were before the district court, which found that the parties intended the January 1984 Agreement to require Imports to deal exclusively in Subaru only if sufficient Subaru inventory was provided. We cannot say that the district court clearly erred in finding that Imports' course of performance failed to demonstrate an intent sufficiently clear to illuminate the facial ambiguity. Fed.R. Civ.P. 52(a).

■ Nor do we believe the district court improperly considered the parties' course of dealing under the 1981 Agreement in finding that the parties' intended that Imports maintain its Webster Groves facility exclusively for Subaru only if Mid-America supplied sufficient vehicles. "A course of dealing is a sequence of previous conduct between the parties to a particular transaction," Mo.Rev.Stat. § 400.1–205(1), that "give[s] particular meaning to and supplement[s] or qualif[ies] terms of an agreement." *Id.* § 400.1–205(3). The 54,375 total square foot requirement in the 1981 Agreement, the district court found, served essentially the same purpose as the 43,500 total square foot requirement in the January 1984 Agreement. The district court therefore properly considered Mid-America's waiver of the total square foot requirement throughout the parties' course of dealing in finding that the parties understood this requirement to apply only when necessary to ensure the availability of adequate space to sell, service, and store the Subaru line.

■ A contract is ambiguous if it is reasonably susceptible of more than one construction. *Property Tax Research Co. v. Falstaff Brewing Co.,* 708 F.2d 1333, 1336 (8th Cir.1983) (applying Missouri law). Whether a contract is ambiguous is a question of law. *Press Machinery Corp. v. Smith R.P.M. Corp.,* 727 F.2d at 784. We conclude that the January 1984 Agreement is ambiguous on its face and is not sufficiently clarified by surrounding circumstances so as to permit us to ascertain the parties' intent. As a contract open to more than one interpretation must be construed against the party which drafted it, *Empire Gas Corp. v. Small's LP Gas Co.,* 637 S.W.2d 239, 247 (Mo.Ct.App.1982), we are

compelled to conclude that the 960 square foot showroom space requirement of Schedule A prevails over the 2,264 square foot showroom requirement in Paragraph 9, and that the 43,500 total square foot requirement may be enforced by Mid-America only if it supplies Imports with sufficient Subaru vehicles to necessitate the exclusive use of such space. We therefore hold that Imports did not default on its obligations under the January 1984 Agreement by selling Peugeot from its Webster Groves facility. Because without default the Franchise Act bars nonrenewal, the district court properly enjoined Mid-America from nonrenewing Imports' Subaru franchise.

## IV.

■ Mid-America challenges the district court's conclusion that even if Imports had defaulted on the January 1984 Agreement, it was not in "substantial default" within the meaning of the Franchise Act. The Franchise Act does not define "substantial." In determining whether Imports' acquisition of the Peugeot franchise was a substantial default under the January 1984 Agreement, the district court focused on whether Imports' action would detrimentally affect Mid-America's business. Mid-America agrees that the district court undertook the correct legal inquiry. The district court found that Imports' sale of Peugeot neither caused Mid-America damage, nor would decrease Mid-America's future sales or encourage its 10 single-line dealers to violate their obligations to Mid-America to remain so. We cannot say that these findings are clearly erroneous. Fed.R. Civ.P. 52(a). We therefore conclude that the district court properly determined that even if Imports had defaulted, its default was not substantial within the meaning of the Franchise Act.

## V.

Mid-America challenges the district court's conclusion that because it failed to supply sufficient Subaru inventory, the purported exclusive space obligations are not "reasonable" within the meaning of the Franchise Act. Mid-America argues that the district court clearly erred in finding that Mid-America limited the number of Subaru vehicles available to Imports, and that Mid-America's justification for the exclusivity requirement was unsupported by fact. Mid-America also charges that the district court misconstrued the Franchise Act's reasonableness standard, and in so doing, interfered with Mid-America's legitimate exercise of business judgment. To support this contention, Mid-America points to cases construing similar statutes from other states, in which courts permitted termination of motor vehicle franchise agreements.

■ Mid-America attacks two findings of the district court as clearly erroneous. The district court found that while Mid-America purportedly required Imports to hold its entire lot, including its entire showroom, for Subaru products, during the life of the January 1984 Agreement, Mid-America never provided sufficient vehicles to permit Imports to maintain either its planning volume or its required monthly ending inventory. At times, Imports did not have enough vehicles even to fill its showroom. Mid-America asserts that "other than administering the turn and earn system, Mid-America had absolutely nothing to do with the number of Subaru Imports receives." Appellant's Brief at 36. Mid-America's finger-pointing at its ostensibly neutral system is facetious. Turn and earn is Mid-America's system. While it may have permitted Mid-America to allocate fairly the scarce supply among dealers, the system obviously did not mitigate the overall shortage that left Imports' lot half-empty. To supply sufficient inventory, who other than Mid-America could Imports reasonably turn to? The district court did not clearly err in finding that Mid-America failed to provide Imports with sufficient vehicles. The district court also found that Mid-America's justification for requiring Imports to sell exclusively Subaru was without factual basis. Mid-America sought by requiring Imports to maintain a single-line Subaru deal-

**1208**

ership to increase market penetration in the St. Louis area. The district court found that the exclusivity requirement, while reasonable when supply was ample, could not reasonably enhance Mid-America's market penetration while Mid-America was unable to supply Imports with as many vehicles as Imports could sell. This finding is not clearly erroneous. Fed.R.Civ.P. 52(a).

Nor did the district court misconstrue the Franchise Act. The district court determined that in drafting the Franchise Act, the Missouri legislature intended to alter the relative bargaining positions of the new motor vehicle franchisor and franchisee by subordinating express contractual language to notions of reasonableness. The Franchise Act thus contemplates precisely what Mid-America objects to: judicial oversight of the terms of the franchise relationship. Mid-America's complaint that the district court interfered with its business judgment thus is better directed to the Missouri legislature than to us. The question we must address is whether the district court properly concluded that the exclusivity requirement was unreasonable as long as Mid-America failed to supply Imports with sufficient Subaru vehicles.

█ We believe the district court's conclusion was proper. Mid-America did not make available sufficient vehicles to reasonably allow Imports to maintain a profitable single-line dealership. The exclusivity requirement would not reasonably increase market penetration. All other St. Louis area Subaru dealers carried more than one line, some of which competed with Subaru, placing Imports at a competitive disadvantage to other St. Louis area Subaru dealers. Peugeot does not compete with Subaru. Imports agreed to discontinue Peugeot sales from the Webster Groves facility should Mid-America provide sufficient Subaru inventory to permit Imports to maintain a profitable business. Under these circumstances, we agree that the exclusivity requirement is not a reasonable obligation within the meaning of the Franchise Act.

To show that the district court misconstrued the Franchise Act's reasonableness standard, Mid-America points to *Scuncio Motors, Inc. v. Subaru of New England, Inc.,* 555 F.Supp. 1121 (D.R.I.1982), *aff'd,* 715 F.2d 10 (1st Cir.1983), and *Brattleboro Auto Sales, Inc. v. Subaru of New England, Inc.,* 633 F.2d 649 (2d Cir.1980), both involving a Subaru dealer and a regional distributor. In *Scuncio,* the court permitted termination of a franchise agreement when the dealer, after agreeing to relocate to a larger facility to accommodate Subaru of America's national minimum space standards, failed to do so. Construing the Rhode Island Motor Vehicle Manufacturers and Dealers Act, R.I. Gen.Laws § 31–5.1–1 *et seq.* (1982), a statute similar in purpose and design to the Franchise Act, the court held that the dealer's failure to move gave the distributor "good cause" for termination. *Id.* at 1136 (referring to the language of the statute, R.I.Gen.Laws § 31.–5.1–4(D)(1)). The court, however, specifically found that had the dealer relocated to a larger facility, the distributor would have provided the dealer with "sufficient product supply." *Id.* As the district court here found, Mid-America did not and could not make similar guarantees. *Scuncio,* therefore, is clearly distinguishable from the present case. In *Brattleboro,* the dealer alleged that its Subaru franchise had been improperly terminated under the Vermont Motor Vehicle Manufacturers, Distributors and Dealers Franchising Practices Act, 9 Vt.Stat.Ann. §§ 4071–83 (Supp.1979), also similar to the Franchise Act. The distributor asserted, referring to the language of the Vermont statute, that "due cause" for termination arose when the dealer added the Buick, Pontiac, and GMC light truck lines. The dealer already was selling Saab and International Harvester in addition to Subaru. The court concluded that the distributor could reasonably have determined that Subaru sales and service would suffer as a result of the dealer's "simultaneous promotion of several lines of directly competing cars * * *." *Id.* at 652. In the present case, Imports' sells only one line in addition to Subaru, which the district court

found does not compete with Subaru, and which Imports has agreed to discontinue when supplied with sufficient Subaru inventory. Therefore, *Brattleboro* also is inapposite.[2]

### VI.

Mid-America finally claims that the district court's imposition of permanent injunctive relief was improper because Imports did not demonstrate that it would be irreparably harmed should Mid-America terminate its Subaru franchise; that Imports should have been equitably estopped from challenging the January 1984 Agreement after indicating its assent to abide by its terms; that Imports was guilty of unclean hands in obtaining the Peugeot franchise without first informing Mid-America; and that the remedy imposed will require ongoing judicial supervision.

 The district court based its finding of irreparable harm on the plausible testimony of Imports' expert accountant witness that without the Subaru franchise, Imports would be unable to meet its fixed and semi-fixed costs. Mid-America has not demonstrated that the district court's acceptance of the expert testimony is clearly erroneous. *See Anderson v. City of Bessemer City*, 105 S.Ct. at 1513 (acceptance of plausible expert testimony virtually never can be clearly erroneous). Mid-America's equitable claims similarly are without merit. As we earlier stated, the district court did not clearly err in finding that Imports did not, through its course of performance under the January 1984 Agreement, indicate its assent to maintain a single-line dealership. In addition, considering that Imports had sold more than one manufacturer's line during virtually its entire relationship with Mid-America, as did all other St. Louis area Subaru dealers, and considering that the January 1984 Agreement was ambiguous as to exclusivity requirements, we cannot say Imports acted in bad faith in obtaining the Peugeot franchise without first notifying Mid-America.

We also reject the claim that enforcement of the permanent injunction will require ongoing judicial supervision. We do observe, however, that over the course of the parties' relationship, the franchise agreement has been renegotiated from time to time and that the January 1984 Agreement, under which the parties continue to do business, was due to expire well over one year ago. The parties have not addressed the question whether the January 1984 Agreement may now be renegotiated, and on what terms. Should Mid-America desire at this time to alter the terms of the January 1984 Agreement, as interpreted by the district court and approved by this court, questions regarding the permissible scope of modification should be addressed to the district court.

### VII.

We conclude that the district court, pursuant to its authority under the Franchise Act, properly permanently enjoined Mid-America from not renewing its Subaru franchise agreement with Imports due to Imports' sale of the Peugeot line. The order of the district court, therefore, is affirmed.

---

**2.** The district court in the present case determined that the "good cause" and "due cause" language of the Rhode Island and Vermont statutes was less stringent than the Franchise Act's substantiality and reasonableness requirements and on this basis held *Scuncio* and *Brattleboro* inapposite. Because the cases are distinguishable on the facts, we need not consider this legal issue.