875 F.Supp. 590 (1995)
SHERWOOD FORD, INC.
and
J. Curt Wells Plaintiffs/Counter-Claim Defendants,
v.
FORD MOTOR COMPANY.
FORD LEASING DEVELOPMENT COMPANY, Defendants/Counter-Claim Plaintiffs,
v.
Ken and Joanne BERDOS, as Individuals and as Co-Trustees of the Berdos Family Trust Counter-Claim Defendants.
No. 4:93 CV 2540 SNL.
United States District Court, E.D. Missouri, Eastern Division.
January 30, 1995.
*591 Ferne P. Wolf, Carr and Korein, St. Louis, MO, Eugene Isaak, Lexington, MA, for Sherwood Ford, Inc., J. Curt Wells.
Kurt David Williams, George E. Feldmiller, Stinson and Mag, Kansas City, MO, for Ford Motor Co., Ford Leasing Development Co.
David M. Dolan, President, Louis J. Garavaglia, Jr., Vatterott and Shaffer, St. Louis, MO, for Ken Berdos, Joanne Berdos.

MEMORANDUM AND ORDER
LIMBAUGH, District Judge.
This matter is before the Court on the Plaintiff's application for a Permanent Injunction to reinstate his franchise with Ford Motor Company and Ford's Motion for Preliminary and Permanent Injunction to terminate his franchise. The Plaintiff initially filed for a temporary restraining order which was denied by this Court on December 14, 1993. Ford Motor has filed a counter claim under the Lanham Act, and its Missouri counterpart, for misappropriation of the Ford trademark and dilution of that trademark. The question of ownership of the dealership site still remains, and there is an outstanding motion for sanctions.

Findings of Fact
In 1983, J. Curt Wells, a St. Louis businessman, entered into a contract with Ford to operate the Sherwood Ford dealership in St. Louis County. As a part of establishing the dealership, the parties negotiated the Ford Sales and Service Agreement (FSSA). This agreement set forth the obligations of both parties. Because the St. Louis area is a multiple point, a term used by Ford to describe areas served by more than one franchise, the performance requirements set out for Mr. Wells were tied in with the performance of other dealers. Mr. Wells was given an assigned share of the market which took into account the characteristics of his primary market area.
The first three years of the franchise were profitable for both Mr. Wells and Ford. *592 Sales were at acceptable levels and Mr. Wells was meeting his requirements.
In 1986, Sherwood Ford reported substandard sales. After numerous letters and phone calls went unanswered, executives from Ford sent registered mail to Mr. Wells to set up a time to meet with the Plaintiff to help him improve sales figures. Sherwood had rated the worst in sales in the multiple point and the worst in Ford's Quality Commitment Program (QCP), a measurement of consumer satisfaction and overall quality. The Q.C.P. rating was the lowest in the St. Louis multiple point and the lowest in the Kansas City region. The Plaintiff was warned that this sort of mismanagement would put him out of business (Def. Ex. B, pp. 1-2).
The next year, sales continued to fall short of target numbers. Ford executives met with Mr. Wells and recommended solutions which included hiring sales managers for different aspects of the dealership, coordinating promotions with Ford, and increasing advertising during special promotions (Def. Ex. C, p. 2).
Not only did the sales figures remain substandard, Sherwood continued to have quality control problems. In October of 1987, a Ford representative met with Mr. Wells to tell him that recent reports, which included the Plaintiff's expulsion from the Better Business Bureau, and a letter to Ford from a customer who had filed a police report after he was physically detained during a sales pitch, were unacceptable.
Because of poor overall performance at the end of 1987, there were preliminary discussions between Ford and Sherwood about relocating the dealership. Both parties wanted to look into the matter further. (Def. Ex. D).
In October of 1988, Mr. Wells wrote to Ford to ask formal approval for a move. He thought that his sales might be improved if he were at a new location. He identified a location near Interstate 270. In his letter to Ford Motor, Mr. Wells reported:
As per my Numerous conversations with J.C. Collins upon the relocation of Sherwood Ford to the area of highway 270, this is a formal request for your approval. Due to the increase in traffic upon Highway 270, I feel this would be advantageous to both Ford Motor Company and Sherwood Ford.
Defense Ex. E.
The people at Ford encouraged Mr. Wells to move the dealership and offered the assistance of the Real Estate division. Mr. Wells never moved the dealership. He put off Ford executives and was evasive when they asked about the move. He made oral commitments which he never fulfilled. Although he had been an eager, early proponent of the move, he was never able to accomplish it.
When the dealership had reported successive years of substandard numbers, executives at Ford tried to encourage production by establishing a Stair-Step program. The program set six month sales goals at above average rates. The program was designed to encourage Mr. Wells to get actively involved in his dealership; however, he continued to neglect the dealership; ignore phone calls and correspondence from Ford, and report sales of a substandard level.
On February 15, 1993, Ford Motor notified Sherwood Ford and Mr. Wells that his franchise would be discontinued. Ford said that he had not met the requirements of their contract in the Ford Sales and Service Agreement. Mr. Wells had failed to provide an adequate dealership facility; failed to promote aggressively the sale of new cars and trucks; failed to promote vigorously the sale of parts; and failed to maintain competent staff (Def. Ex. RRR).
Mr. Wells was given an opportunity to appeal this to the Ford Dealer Policy Board. This Board is composed of three experienced Ford managers who take the job as their last position at Ford in order to create some level of impartiality. Mr. Wells met with the board in Detroit and was given one final opportunity. He did nothing to take advantage of that opportunity. As a part of the termination process, he was sent a waiver of liability which indicated that a failure to reject the waiver would indicate acceptance. He never returned the waiver.

*593 Conclusions of Law

This is an action for a permanent injunction. Like a preliminary injunction, the court must consider:
the threat of irreparable harm; the state of balance between such harm and the injury that granting the injunction will inflict on other parties litigant; the probability that plaintiff will succeed on the merits' and the public interest
Dataphase Systems, inc. v. C.L. Systems Inc., 640 F.2d 109, 113 (8th Cir.1981). In an action for permanent injunction, the standard is essentially the same, except that the Court determines the success on the merits rather than a mere likelihood of success. Amoco Production Co. v. Village of Gambell, Alaska, 480 U.S. 531, 546, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987) (citations omitted).
Dealer termination cases come under a federal and a state statute. The federal statute is know as the Automobile Dealer's Day in Court Act 15 U.S.C. § 1221 and Missouri's companion act is called the Missouri Vehicle Franchise Practices Act, Mo.Rev. Stat. § 407.810.
The federal act was designed to create a level playing field for negotiations between local businessmen and multinational automotive companies. However, it was not designed to tilt the balance of power so heavily in favor of dealers as to tie a manufacturer to an undesirable and unproductive dealer. Kenworth Truck Sales v. Kenworth Truck Co., 781 F.2d 1520, 1525 (11th Cir. 1986).
The dealer's actions must pass a good faith test. The federal statute defines good faith as:
[T]he duty of each party to any franchise ... to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party; Provided, that recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.
15 U.S.C. § 1221(e) (1976).
Bad faith under the Act is not just the absence of good faith. It has been defined narrowly and construed strictly. It does not mean a lack of fairness, but requires a showing of coercion. H.C. Blackwell Company, Inc. v. Kenworth Truck Company, 620 F.2d 104, 106 (5th Cir.1980).
The Ford Motor Company has not violated the Federal Dealer's Day in Court Act. There is no showing of bad faith. Sherwood was terminated because it didn't sell enough cars and trucks to meet the requirements of the FSSA. It also did not establish a facility that met with the approval of Ford.
The Plaintiff attempts to argue that the numbers presented to the Court were not accurate or that the numbers of the Stair-Step program were not realistic. The Court finds that the numbers Ford used to determine performance were reasonable and that the Stair-Step numbers were not the critical numbers to the decision to terminate the franchise. In any event, a dealer may be terminated for substandard sales performance, Kotula v. Ford Motor Co., 338 F.2d 732 (8th Cir.1964) (citations omitted), which occurred here.
The Plaintiff's next argument is that Ford's requirement that the dealership find a new location shows bad faith. However, the facts of this case reveal that it was the Plaintiff who asked for formal permission to move. In addition, the argument lacks merit because court's have held that manufacturers may allocate their resources in metropolitan areas, and that if a dealer fails to meet the contract provisions requiring a suitable location, the manufacture may terminate the franchise. Winning Chrysler-Plymouth v. Chrysler Motors Corp., 750 F.2d 895, 899 (11th Cir.1985); Scuncio Motors, Inc. v. Subaru of New England, 555 F.Supp 1121, 1137 (D.R.I.1982); Studebaker Sales v. Nissan Motor, 533 F.2d 510, 515 (10th Cir. 1976).
*594 The analysis under the Missouri Vehicle Franchise Practices Act is similar. The Eighth Circuit has interpreted the statute to mean that the termination of a vehicle franchise violates the act unless the franchise was in default of provisions of the franchise agreement, that default was substantial, and the provisions defaulted upon were reasonable. G.A. Imports Inc. v. Subaru Mid-Am., Inc. 799 F.2d 1200, 1205 (8th Cir.1986).
The Court finds that all three prongs of the test for the Missouri act have been met. The same facts, substandard sales and refusal to relocate the dealership in accord with the FSSA, are defaults on reasonable provisions of the agreement.
Having determined that the dealership termination did not violate either federal or state law, the Court turns to Ford's counter-claim. Ford alleges trademark infringement under the Lanham Act, 15 U.S.C. § 1051 et seq. The act provides that: "[A]ny person who shall use in commerce ... a registered mark in connection with the ... advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake without consent of the registrant shall be liable in a civil action." Downtowner/Passport Int'l Hotel v. Norlew, Inc., 841 F.2d 214, 219 (8th Cir.1988).
A licensee's continued use of a trademark after the termination of the license agreement constitutes trademark infringement. Burger King v. Mason, 710 F.2d 1480, 1493 (11th Cir.1983). In this case, as in Downtowner, the franchisee has continued to use the franchisor's sign throughout his store and in advertisements. The likelihood of confusion that this creates with the public constitutes trademark infringement under the Lanham Act.
The same set of facts lead to the same conclusion on the state law claim of dilution of trademark under Mo.Rev.Stat. § 417.061. The Court finds that the likelihood of injury to business reputation and the dilution of the distinctive Ford trademark in script and block letters is grounds for relief. Gilbert/Robinson Inc. v. Carrie Beverage-Missouri Inc., 758 F.Supp 512, 527 (E.D.Mo. 1991).
Because the Court finds in favor of Ford on the merits, it is unnecessary to address the issue of the waiver which Sherwood received as a part of the termination process. It is also unnecessary to present an analysis of whether Mr. Wells is a proper party to the suit or whether the dealer act claims may only be filed by Mr. Wells in the form of Sherwood Ford Inc.
A remaining issue is ownership of the land. On August 8, 1994 the Court issued partial summary judgment on this issue and ordered that the Plaintiff convey the deed to the property to Ford, 860 F.Supp. 659. The Plaintiff has filed a motion to reconsider that decision arguing that Ford failed to exercise its right of first refusal or, in the alternative, that if it did exercise that right it was done for improper reasons. The Court finds no convincing evidence to indicate that Ford would not have exercised its right of first refusal when the purchase price of the property was one half the estimated market value. The Court is also persuaded that Ford would have needed the land to offer to a new franchisee during the interim period before a new site could be established.
Finally, the Court turns to the Plaintiff's motion for sanctions. This motion arose from a last minute discovery request that the Plaintiff made during the second week of trial. The Defendant did respond to the request in a timely and appropriate manner. The Court is not influenced by the news articles submitted by the Plaintiff that document examples of discovery delays in other cases.
Accordingly,
IT IS HEREBY ORDERED that the Plaintiff's Motion for a Preliminary Injunction (# 14) filed December 16, 1993 is DENIED.
IT IS FURTHER ORDERED that the Defendant's Motion for a Preliminary and Permanent Injunction (# 18) filed January 13, 1994 is GRANTED.
IT IS FURTHER ORDERED that the Plaintiff remove the signs that identify Sherwood as a Ford dealer; no longer advertise or hold itself out as a Ford dealer; and *595 change its corporate name so that Ford does not appear therein.
IT IS FURTHER ORDERED that the Plaintiff's Motion to Reconsider (# 64) filed august 10, 1994 is DENIED.
IT IS FINALLY ORDERED that the Plaintiff's Motion for Sanctions (# 73) filed august 22, 1994 is DENIED.