**FOREIGN MOTORS, INC., Plaintiff,**

v.

**AUDI OF AMERICA, INC. and Volks-wagen of America, Inc. d/b/a Audi of America, Defendants.**

**Civ. A. No. 91–10086–H.**

United States District Court,
D. Massachusetts.

Jan. 23, 1991.

Shepard M. Remis and Dennis R. McBride, Goodwin, Procter & Hoar, Boston, Mass., for Audi of America, Inc. and Volkswagen of America, Inc.

Loyd M. Starrett, Fordham & Starrett, Boston, Mass., for Foreign Motors, Inc.

## MEMORANDUM AND ORDER

HARRINGTON, District Judge.

Plaintiff Foreign Motors, Inc. ("FMI"), commenced this action in response to an attempt by the Defendants Audi of America, Inc. and Volkswagen of America, Inc. (hereinafter collectively referred to as "Audi"), to terminate FMI's franchise to sell, lease and service Audi automobiles. Plaintiff's complaint alleges that Audi terminated FMI's franchise arbitrarily and without good cause, and it charges Audi with a violation of the Massachusetts regulatory statute, Mass.Gen.L. ch. 93B ("Chapter 93B"), breach of contract, and breach of the duty of good faith and fair dealing.

The action is now before this Court upon the plaintiff's Motion for Injunctive Relief pursuant to Mass.Gen.L. ch. 93B, § 4(3)(e)(3) and Mass.R.Civ.P. 65. On October 16, 1990 Audi notified FMI that its franchise would be terminated, effective January 15, 1991. On January 4, 1991 FMI moved for a stay of termination, pending final resolution of its dispute with Audi.[1] On January 14, 1991 this Court held a hearing on that motion and issued a preliminary order granting a stay of termination until this Court had sufficient opportunity to review the documents filed and to reflect upon the arguments raised by counsel at the hearing. Now, upon full consideration of this matter, this Court finds that a stay of termination is not warranted. For the reasons set forth below, FMI's motion is denied.

## BACKGROUND

FMI has operated in Boston, Massachusetts, for many years as an authorized dealer of certain imported luxury cars. Under individual dealer agreements, FMI sells, leases and services automobiles for BMW, Mercedes–Benz, Porsche and Audi. In October, 1986 the owners of FMI agreed to sell 12.5 percent of FMI's stock to MBPA Corporation ("MBPA"), a company wholly owned by Herbert G. Chambers ("Chambers"), and to grant MBPA an option to purchase the remaining FMI stock. In March, 1987 MBPA exercised its option to purchase the remaining stock, and on November 6, 1987 Chambers, through MBPA, became the sole owner of FMI.

FMI's sale to Chambers was subject to certain existing agreements concerning the business operations of FMI. Specifically, FMI's prior owners had entered into three agreements—an Asset Purchase Agreement, an Extension Agreement and a Lease—with Bahig F. Bishay ("Bishay"), another automobile dealer who had sought to purchase FMI but whose proposed purchase was ultimately rejected. The agreements required the owner of FMI to remain in FMI's existing facilities, to maintain the premises in the same condition and repair, and to conduct the business in the same manner as it had been conducted, as though no change of ownership were contemplated or effectuated. Chambers was fully apprised of these agreements and agreed to purchase FMI subject to the constraints which the agreements imposed.

In December, 1986 Bishay commenced two court actions in Suffolk Superior Court (hereinafter referred to as the "Bishay litigation"), alleging that FMI breached its obligations to Bishay and seeking transfer of the FMI franchise from Chambers to Bishay. In 1988 the Superior Court made certain preliminary determinations and or-

---

**1.** Plaintiff originally filed the Complaint and Motion for Injunctive Relief in Suffolk Superior Court. Defendants then removed the action to this Court on January 10, 1991.

dered that the three agreements between FMI and Bishay continue in force, beyond their expiration, pending final resolution of the Bishay litigation. Just a few months ago the Special Master assigned to the Bishay litigation recommended that Bishay's claims be dismissed. Oral argument was held on December 19, 1990, and final resolution of the litigation is expected shortly. Should the outcome be favorable to FMI, Chambers will be discharged of any obligations under the existing agreements with Bishay.

At the time Chambers purchased FMI and entered into a new "Audi Dealer Agreement" with Audi, both parties were aware that the franchise consistently had experienced financial and operational difficulties, including massive operating losses, high employee turnover, and poor customer satisfaction ratings. Since acquiring ownership of FMI, Chambers apparently invested $6.4 million to re-capitalize FMI and to fund accrued losses. He also replaced sales and service employees to improve the quality of customer service. Nevertheless, the franchise has continued to fall below Audi's established capital requirements, sales objectives and performance standards. Thus, FMI has continuously failed to achieve compliance with the terms of the Audi Dealer Agreement.

### DISCUSSION

In this case, FMI argues that its shortcomings are substantially attributable to the constraints imposed on its operations by the Bishay litigation. FMI contends that Audi should not penalize FMI for failing to attain certain rigid objectives which FMI could not reasonably attain under the conditions imposed by the Bishay litigation, particularly where Audi had full knowledge of FMI's peculiar situation. In light of the fact that the Bishay litigation will soon be resolved and that Chambers would, then, have the opportunity to implement more dramatic changes in the business, FMI suggests that Audi should not terminate FMI's franchise at this time. Moreover, FMI alleges that Audi's decision to terminate emanated from improper motives; namely, FMI states that Audi terminated the franchise upon learning that Chambers might seek to sell FMI. According to FMI, Chambers carried FMI through its serious difficulties, and now that FMI might be marketable, Audi is desirous of the opportunity to reap any benefits.

Audi responds that, despite the steadfast assistance of Audi and its executives, FMI never satisfied the requirements of its dealer agreement with Audi. Audi appreciated the constraints imposed upon FMI as a result of the Bishay litigation and Audi adjusted its performance expectations accordingly. However, FMI's deficiencies persisted. In view of the poor performance and unprofitability of the FMI franchise, Audi claims that it made a business determination to terminate FMI. Audi insists that it had been considering termination for some time prior to its learning of Chambers' intention to sell FMI and, thus, that this information did not produce the termination. Audi does concede that this information heightened its concern, however. In particular, Audi feared that Chambers might lose interest in FMI and decline to invest more money in the business.

### The Propriety of Granting a Stay

In this Court's opinion, the decision to grant a stay of termination pursuant to Chapter 93B depends on FMI's ability to satisfy certain well-established criteria, including a showing of both irreparable injury and a reasonable likelihood of success on the merits of plaintiff's claim. *Cf. Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981) (establishing criteria for preliminary injunction). FMI, however, suggests that this Court need only find that the plaintiff has "raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for litigation and thus more deliberate investigation." *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205–06 (2d Cir.1970). The Court, plaintiff argues, need not undertake the more rigorous analysis that it would undertake in determining entitlement to a preliminary injunction.

Plaintiff's argument fails for two reasons. First, though the language of Chapter 93B sets forth no specific test for determining a party's entitlement to a stay,[2] the thrust of the statute is to provide *"injunctive* relief" to dealers threatened with termination of their franchise. *See Reiter Oldsmobile, Inc. v. General Motors Corp.,* 378 Mass. 707, 709, 393 N.E.2d 376 (1979) (emphasis added).[3] Thus, a stay of termination is essentially identical to a preliminary injunction, and, as such, a plaintiff must meet the well-established criteria governing entitlement to such relief. The Court may exercise some discretion in evaluating the need for a stay in each particular case, but the Court, nevertheless, must find:

> (1) that plaintiff will suffer irreparable injury if an injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Camel Hair & Cashmere Institute, Inc. v. Associated Dry Goods Corp.,* 799 F.2d 6, 12 (1st Cir.1986) (citing *Planned Parenthood,* 641 F.2d at 1009).

Second, the facts of this case, unlike those of the *Semmes* case relied upon by the plaintiff, provide no compelling reason to depart from these four criteria. The Second Circuit applied a different, less stringent test when presented with the facts in *Semmes,* because an "imbalance of hardship" clearly existed. *Semmes,* 429 F.2d at 1205. However, the case before this Court differs markedly from *Semmes* and presents no such imbalance. On the contrary, in this case the hardships to each party, that would stem from this Court's decision to stay termination, are fairly balanced.[4] Thus, unlike *Semmes,* no reason exists to depart from the requirement that plaintiff satisfy all four criteria. Plaintiff's ability to demonstrate irreparable injury and a likelihood of success on the merits, therefore, is essential to the relief which is sought here. Because this Court finds that FMI has failed to satisfy its burden on these issues, it need not address the other criteria.

*Irreparable Injury*

■ Whatever harm FMI may suffer by having its franchise terminated does not constitute *irreparable* injury. First, the loss of the Audi franchise may result in reduced revenue, but FMI will not go out of business altogether. FMI will still be able to deal in BMW, Mercedes–Benz and Porsche automobiles, and money damages would suffice to compensate for any loss of additional revenue attributable to Audi sales. *See C–B Kenworth, Inc. v. General Motors Corp.,* 675 F.Supp. 686, 687–88 (D.C.Me.1987) (finding all alleged injuries

---

2. Chapter 93B provides that the court "may modify or stay the effective date of [termination] ... pending a final determination of the issues raised [in plaintiff's complaint] ... upon such terms as it may determine." Mass.Gen.L. ch. 93B, § 4(3)(e)(3). The statute further provides that the stay be effective for "thirty days unless extended by the court for good cause." *Id.*

3. The court in *Reiter* specifically referred to the relief provided under Chapter 93B as "limited injunctive relief." In doing so, the court was referring to the 1970 version of Chapter 93B under which the right to petition for a stay was "limited" to the Attorney General. Subsequent amendments to the statute have extended the right to petition for a stay to individual dealers, *see* St.1977, c. 717, § 3. The amendments, however, have not altered the correctness of *Reiter's* characterization of a stay as a form of injunctive relief.

4. Plaintiff FMI stands to lose substantially less from termination of its Audi franchise than the plaintiff in *Semmes* stood to lose from the termination of his Ford dealership, while Audi faces greater hardship from the continuation of the franchise than Ford faced. Unlike the dealer in *Semmes,* FMI sells and services automobiles of three other manufacturers, so the loss of the Audi franchise will not drive plaintiff out of business. Moreover, FMI is not Chambers' family enterprise; rather Chambers operates other dealerships and, thus, will not be deprived of his livelihood—his opportunity to sell automobiles. Finally, though Ford would have lost little in continuing Semmes' dealership, Audi would suffer both damage to its reputation and a significant loss of business in the Boston market were the FMI franchise to continue.

from loss of truck franchise to be compensable at law); *Miller Plymouth Center, Inc. v. Chrysler Motors Corp.*, 286 F.Supp. 529, 532 (D.Mass.1968) (recognizing the difficulty of calculating damages, but not finding the task "impossible"). Moreover, given FMI's poor customer service ratings vis-à-vis its Audi customers, the extent of harm to the dealership's reputation or goodwill as a result of the termination of its Audi franchise is fairly speculative. *Cf. John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 588 F.2d 24, 29 (2d Cir.1978) (noting possibility of irreparable injury to goodwill where termination causes dealer to lose its reputation as a "dependable distributor"). FMI cannot demonstrate to this Court that it will suffer irreparable harm in the absence of a stay of termination.

*Likelihood of Success: "Good Cause" Under Chapter 93B*

■ Chapter 93B prevents a manufacturer from terminating a franchise agreement with an automobile dealer "without good cause," Mass.Gen.L. ch. 93B, § 4(3)(e), but the statute does not define specifically what is meant by the term "good cause." The Legislature provided some guidance, directing the court to consider "all pertinent circumstances," including, but not limited to, the amount of business transacted by the dealer, the level of investments made, the adequacy of the services provided, and the existence of any breach of the terms of the franchise agreement. *See* Mass.Gen.L. ch. 93B, § 4(3)(e)(4). In addition, Massachusetts courts, grappling with the somewhat analogous concepts of "due cause" and "just cause," have taken into account both the business judgment of the decisionmaker and the economic realities confronting the business. *See Amoco Oil Co. v. Dickson*, 378 Mass. 44, 50, 389 N.E.2d 406 (1979) (finding Amoco's "good faith business judgment" to terminate an agreement be-

cause of the dealer's unprofitability sufficient to satisfy "due cause" standard); *Zussman v. Rent Control Bd.*, 367 Mass. 561, 566–67, 326 N.E.2d 876 (1975) (upholding unit-by-unit conversion of rent-controlled apartments to condominiums to be just cause for eviction); *Dooling v. Fire Com'r of Malden*, 309 Mass. 156, 162, 34 N.E.2d 635 (1941) (holding that "reasons of economy constitute just cause" for abolishing a position).

*Amoco* is particularly instructive. In that case, a supplier, Amoco Oil Co., terminated a lease agreement with a retail gasoline dealer because the station was "insufficiently profitable." *Amoco*, 378 Mass. at 45, 389 N.E.2d 406. The dealer challenged the termination under Mass.Gen.L. ch. 93E, a statutory provision very similar to Chapter 93B, which protects retail dealers from termination of their marketing agreements unless "due cause" exists for such termination. Mass.Gen.L. ch. 93E, § 5A. The court acknowledged the Legislature's concern with eliminating the historical imbalance of bargaining power between retail dealers and oil companies, but it nevertheless refused to enforce marketing agreements with "dealers whose business operations had been and would be chronically and irremediably unprofitable to the suppliers." *Amoco*, 378 Mass. at 50, 389 N.E.2d 406.

In the case at bar, this Court confronts a similar situation. Audi insists that it has legitimate and compelling business reasons for terminating the FMI franchise. In particular, the evidence indicates, and FMI does not directly dispute,[5] that the sales record of FMI consistently fell below Audi's established sales objectives. Most recent statistics show that FMI attained only 23.2 percent of its projected sales, while dealers in the Boston Metro area and the Atlantic Zone reached 85.3 percent and 77.8 percent of their objectives, respectively. FMI's customer satisfaction ratings and its service record were also deficient.

---

**5.** FMI does assert that its inability to meet sales objectives is a result of the negative publicity which Audi received in 1986 concerning the "sudden acceleration" of its automobiles, the downturn of the New England economy and the increased competition from Japanese imports. However, these factors cannot explain FMI's poor performance in comparison to all other dealerships in the Boston Metro area and the Atlantic Zone.

Moreover, Chambers equity in FMI is $638,544, only 26.3 percent of Audi's capital requirement, while FMI's working capital stands at only 15.4 percent of Audi's requirement. In sum, FMI has experienced, and continues to experience, serious operational difficulties, and the franchise has continually failed to comply with performance standards set out in the Audi Dealer Agreement. Repeated correspondence with, and assistance from, Audi executives has been unsuccessful in bringing about any change.

In light of the overwhelming evidence of FMI's deficiencies,[6] Audi had sound business reasons and sufficient "good cause" to terminate FMI.[7] *See* Mass.Gen.L. ch. 93B, § 4(3)(e)(4). Though Chapter 93B unquestionably sought to protect automobile dealers from the "inequitable consequences of overweening economic power wielded by manufacturers," *Tober Foreign Motors, Inc. v. Reiter Oldsmobile, Inc.*, 376 Mass. 313, 321, 381 N.E.2d 908 (1978), it does not purport to shield them entirely from adverse decisions formulated on legitimate business and economic grounds. *See General GMC, Inc. v. Volvo White Truck Corp.*, 1987 WL 30965, 1987 U.S.Dist. LEXIS 11817 (D.Mass.1987). This Court should not force Audi to continue the franchise where FMI's "chronically and irremediably [poor performance]," *see Amoco*, 378 Mass. at 50, 389 N.E.2d 406, justifiably causes Audi substantial concern.

Given that FMI has failed to demonstrate both irreparable injury and a likelihood of success on the Chapter 93B claim, this Court declines to order the relief sought by the plaintiff. Should plaintiff's claims be successful, this Court believes that the plaintiff will receive adequate money damages to compensate for any lost revenue from Audi sales or any lost income from a

sale of the franchise. The plaintiff's Motion is denied.

SO ORDERED.

Audi learned that Chambers might seek to sell FMI, precipitated the termination. At the hearing, FMI failed to establish more than a mere suspicion of any improper motive on the part of Audi. Moreover, FMI offered no authority for the proposition that the precipitating event is relevant in the face of overwhelming evidence of "good cause."

---

**6.** FMI's contention that the Bishay litigation was primarily responsible for those deficiencies is unpersuasive. The Court does not find that the "constraints" imposed by the litigation concerning location, repair and operations were so significant as to account for the otherwise abysmal performance of the FMI franchise.

**7.** The Court sees no relevance in FMI's allegation that an October 13, 1990 meeting, at which