Stearns, J.
INTRODUCTION
This case came on for trial before the undersigned justice on May 18, 1993. Following five days of testimony, the parties submitted proposed findings of fact and rulings of law. Final arguments were heard on July 30, 1993.
The lawsuit arose out of the refusal of the defendant Subaru of New England (SNE) to renew the dealer franchise of the plaintiff Blackstone Subaru (Blackstone). The issue is whether SNE’s refusal to do so was for good cause. The refusal was based on Blackstone’s desire to reconfigure its facility to accommodate a dual operation, or as Blackstone characterized it, an “exclusive contiguous” dealership, consolidating sales and service of Subaru and an undetermined competitor under one roof. The parties agree that G.L.c. 93B and basic contract principles apply.
THE MOTION IN LIMINE
The corporate adversaries in this lawsuit are the alter egos of two strong-willed and successful men, Ernest Boch, the owner of SNE, and Alfredo Dos Anjos, the owner and operator of Blackstone. Boch and Dos Anjos had been associated with one another for nearly a dozen years when this dispute erupted. The litigation is the culmination of a franchise renewal negotiation that began in November 1990, and continued with episodic intensity until July 31, 1991, when SNE terminated Blackstone’s franchise agreement. Driving one side of the impasse was Boch’s personal commitment to the concept of single-line dealerships. Driving the other was Dos Anjos’s worry that Subaru’s eroding cachet in the American market would saddle him with an elephantine, money-eating facility.
Prior to trial, SNE by way of a motion in limine sought to freeze the dispute as of May 30, 1991, the date on which SNE gave Blackstone a non-renewal notice, or as of July 31, 1991, the date which the *243 termination took effect.[1] Specifically, SNE sought to exclude evidence of settlement negotiations, economic developments, Subaru sales trends, and negotiations between SNE and other dealerships occurring after the termination of Blackstone’s franchise. The court allowed the motion in limine (the July 31, 1991, option), except as to any post-termination negotiations with other dealers that might reflect on SNE’s good faith in its dealings with Blackstone.
FINDINGS OF FACT
From the credible testimony and exhibits, I find the following material facts.
1. Bom in Portugal, Alfredo Dos Anjos immigrated to the United States in 1959 at age fifteen. After a tour of duty with the U.S. Army in Vietnam, Dos Anjos entered the automobile business in 1969 as a used car salesman. In 1978, Dos Anjos offered to purchase a financially troubled Subaru dealership in Pawtucket, Rhode Island. The negotiations introduced Dos Anjos to SNE’s owner, Ernest Boch. Boch liked what he saw, and awarded Dos Anjos the Pawtucket franchise. A long and profitable association ensued. By 1987, Blackstone was the most successful Subaru dealer in New England, and the fifth most profitable in the United States. Blackstone’s success enabled Dos Anjos to acquire three additional dealerships, Pride Ford in West Warwick, Rhode Island, Pride Hyundai in Pawtucket, Rhode Island, and Pride Chiysler, in Seekonk, Massachusetts.[2]
2. Ernest Boch joined his father’s Nash dealership in Norwood, Massachusetts, in 1946 after service in the U.S. Army. Boch built an auto empire on his near-legendary success as a car salesman. Today, in addition to SNE, Boch owns Toyota, Mitsubishi, and Oldsmobile dealerships, and a thriving used car business. After an unsuccessful experiment with “dualing” in his early days as an auto magnate, Boch embraced a philosophy of exclusivity, believing that it engendered product mastery, brand loyalty and sales enthusiasm.
3. In 1971, Boch acquired SNE, the New England distributor for Subaru, then an obscure Japanese make of car.[3] When Boch purchased SNE, it ranked last in sales among Subaru’s American distributors. Almost all of the dealers Boch inherited were dual franchises. Subaru in Boch’s estimation was the neglected stepchild, receiving little, if any, nurture from dealers enamored with more popular makes. Boch embarked on a crusade to convert SNE dealers to his marketing credo. By 1991, Boch had cajoled all but eight of his sixty remaining dealers into changing over to a single-line concept.[4] He also instituted a policy of appointing only new dealers who shared his philosophy of exclusivity. By the early 1980s, SNE had captured first position among Subaru’s U.S. distributors, a ranking that it by and large maintained until 1991, despite a dramatic fall-off in Subaru sales.[5]
4. In two instances, both involving dealers in Dos Anjos’s marketing area, SNE proved recreant to the Boch philosophy. In 1989, when Menard Subaru relocated from North Smithfield to Woonsocket, Rhode Island, SNE permitted Menard to install Subaru in the same building as a competing line of cars. The Menard building was partitioned by a solid wall allocating to each dealership one-half of the physical plant. Menard was in serious financial difficulty at the time it consolidated its business in Woonsocket. Menard’s fortunes did not improve, and Menard filed for Chapter 11 protection in early 1990. A second dispensation was afforded Flurkey Subaru in Pawtucket, Rhode Island, in the spring of 1990. Flurkey ensconced Subaru in a self-contained building physically joined to a larger General Motors dealership. Flurkey floundered and voluntarily ceased doing business in early 1991.
5. At their first meeting in 1978, Boch outlined his business plan to Dos Anjos and his belief in the essentiality of exclusivity. Dos Anjos agreed “one hundred percent.” The deal was struck, and in April 1979, Dos Anjos opened the doors of Blackstone Subaru on Division Street in Pawtucket with a three-year franchise agreement.
6. On October 6,1981, in anticipation of refranchis-ing negotiations, SNE wrote to Dos Anjos expressing concern that the Division Street facility did not meet Subaru’s minimum building and lot space requirements for a dealership with Dos Anjos’s projected planning volume of 300 units-[6] SNE suggested that Dos Anjos remedy these deficiencies by acquiring additional land and expanding the existing building. This Dos Anjos agreed to do. Satisfied, SNE on February 2, 1982, agreed to a three-year extension of the franchise. Dos Anjos promised to begin the renovations at Division Street no later than August 15, 1983, and to complete work by November 15, 1983.
7. After failing to secure permission to expand from the Rhode Island Coastal Management Resources authority, Dos Anjos began searching for an alternative site. At Dos Anjos’s request, SNE agreed to several extensions of the renovation schedule.[7] Eventually Dos Anjos, with Boch’s approval, made a successful offer on a parcel of land on Route 44 in Seekonk, Massachusetts.
8. With hard-won zoning approvals in hand, Dos Anjos submitted an architect’s plans for the Seekonk site to SNE for approval. On November 21, 1984, SNE responded with a three-year franchise agreement which Dos Anjos accepted. The building Dos Anjos erected at Seekonk substantially exceeded Subaru’s requirements.[8] The November 21 agreement was premised on a planning volume of 800 to 1,000 vehicles and required that at least 11,905 square feet of the Seekonk building be dedicated to Subaru sales and service. Seekonk opened as Blackstone Subaru in June of 1985.
*244 9. In 1986, Dos Anjos erected a second building on a lot adjoining Blackstone Subaru. In January 1987, Dos Anjos located Pride Chrysler in the building without any objection by SNE.
10. On December 23, 1985, frustrated by Subaru’s unwillingness or inability to increase his allotment of new vehicles, and piqued at SNE’s intention to franchise a competing dealer in his immediate marketing area, Dos Anjos wrote to Henry Burbank, SNE’s Vice President of Marketing, threatening to “dual” his franchise in retaliation. The letter drew an angry reply from Burbank disputing Dos Anjos’s assertions about his vehicle allocation, and warning that any attempt to dual would be treated by SNE as a material breach of the dealership agreement. The matter was dropped.[9]
11. In November of 1987, negotiations over the 1988 franchise began. These resulted in the agreement of January 28, 1988 (which remains in effect today). The 1988 agreement was premised on a reduced planning volume of 571 units. In an addendum to the agreement, Dos Anjos and SNE stipulated that while the Blackstone facility exceeded in all respects Subaru’s minimum dimension requirements, such “excess areas on DEALER’S facility shall be reserved for future expansion of DEALER’S Subaru franchise operations . . . and shall not be utilized in support of any vehicle franchise operations other than Subaru.”
12. Following the 1988 agreement, Blackstone’s sales plummeted. In 1987, Blackstone sold 891 new vehicles; in 1988, 738; in 1989, 350; and in 1990,211. (In this same period, Subaru sales nationally declined from 177,138 units in 1987 to 108,547 units in 1990). Despite the fall-off in sales, Blackstone remained profitable (although progressively less so) through July 1991, largely on the strength of parts and service revenues. Although the parties dispute the magnitude, it is clear that by 1989, Blackstone was losing money on new car sales.
13. In November of 1990, as a prelude to the 1991 renewal negotiations, Richard Bryant, SNE’s Vice President of Franchising, visited Seekonk to confirm the measurements of the Blackstone facility. Dos Anjos asked Bryant for a copy of Subaru’s minimum standards requirements (which Bryant later supplied). Dos Anjos brought up the subject of the Flurkey/Men-ard arrangement and said that he wanted similar consideration from SNE. (Dos Anjos suggested to Bryant that he might otherwise give up the Subaru franchise.) Bryant told Dos Anjos that the Blackstone building was unsuited to a Flurkey/Menard style configuration but that the subject could be discussed with Boch and SNE’s senior management after SNE formulated the renewal offer.
14. On January 14, 1991, Bryant forwarded the draft proposal. The proposal was based on a projected planning volume of 252 units and contained the undertaking that “DEALER stipulates that while its sales and service facility may exceed SNE Minimum Facility Standards, the DEALER has determined that the facility as described below is reasonably required for the proper sales and services functions associated with its exclusive Subaru dealership . . . DEALER accordingly agrees to provide these said facilities exclusively for its Subaru operation throughout the term of this Agreement.” In a cover letter, Bryant assured Dos Anjos that excess capacity was “almost always the case because standards are merely ‘bare bones’ minimum guidelines.”
15. On January 21, 1991, Dos Anjos returned the proposal unsigned, stating that it was not acceptable, '"“one-sided,” “devoid of any of my requests,” and unfair in requiring that excess space be dedicated exclusively to Subaru operations. Specifically, Dos Anjos asked that the stipulation in the addendum dedicating the entire facility to Subaru operations be changed to permit dualing. Bryant wrote back immediately suggesting the meeting attended by Dos Anjos, David Serpa (Blackstone’s manager), Bryant, and Henry Burbank that took place on February 12, 1991, at Blackstone Subaru. The main focus of the meeting was Dos Anjos’s desire to have the option of partitioning the existing building to make space for a second undetermined franchise. Dos Anjos said that he remained committed to SNE’s exclusivity policy but that the existing building was exorbitantly oversized. Dos Anjos complained that his parts and service departments were keeping the dealership afloat, and that if Subaru sales continued to decline, he would be forced out of business. Burbank responded that the Blackstone facility was unsuited to any kind of partition on a Flurkey/Menard model and suggested that Dos Anjos consider instead swapping the Subaru building with the smaller Chrysler building next door.[10] Burbank expressed his personal belief that Chrysler was amenable to dualing. The meeting ended inconclusively with Burbank promising to think about the Flurkey/Menard option before submitting a revised franchise proposal for Don Anjos’s consideration.
16. The second offer, forwarded by Burbank on February 18, 1991, replicated the first with one significant modification.[11] Specifically, the proposal recited SNE’s willingness to consider a “formal written proposal from DEALER to relocate its Subaru dealership operation to a facility (land and building) more in line with current SNE standards . . .” The stipulation that the existing facility was “reasonably required” for Subaru operations remained unchanged. In a cover letter, Burbank wrote Dos Anjos that “after thinking the situation over these past few days,” he had concluded that the Flurkey/Menard experiment had not worked and was not a “prudent option” for Dos Anjos.[12]
17. On February 27, 1991, Burbank offered to extend the existing agreement from April 30 to June 30, 1991, to allow time for further negotiation. Dos Anjos accepted the offer.
*245 18. On March 7, 1991, Dos Anjos wrote to Burbank again objecting that the existing facility was too large for his Subaru business. Dos Anjos stated that he had “hired the architectural firm of A. Caputo to design preliminary facility plans, that would meet Subaru’s standards, preserve the franchises’ [sic] integrity and allow me the necessary flexibility required to survive in this difficult market. Once these plans are complete I will notify you immediately so that we may conclude our agreement...”
19. Having heard nothing further from Dos Anjos, on April 16, 1991, Burbank telephoned to stress the importance of quickly concluding the negotiations. Dos Anjos replied that the architect’s plans would be ready by the end of the week. The plans were sent to SNE on or about April 26.
20. On April 18, 1991, SNE offered to extend the existing agreement an additional month to July 31, 1991. Dos Anjos accepted.
21. The plans submitted by Dos Anjos detailed a 25’ x 68’ showroom integrated into the existing Blackstone facade, filling a portion of a recessed ell at the base of which the Subaru showroom is located. The plans did not show any partition or division of the existing building or make any provision for separate service and parts departments. Rather they showed a connecting door at an existing outside entrance giving access from the new showroom to the Subaru parts, service, and general office areas.
22. On May 1, 1991, in anticipation of a meeting scheduled for May 8, Burbank wrote to Dos Anjos stating that the plans “as submitted” were unacceptable. Burbank specifically objected that the plans failed to preserve the integrity of the Subaru operation.
23. On May 8, 1991, Burbank, Dos Anjos, and their lawyers met at Blackstone Subaru. The discussion quickly turned to the issue of the Flurkey/Menard option. Dos Anjos insisted that Subaru sales could not profitably support the existing building. Burbank was equally insistent that the building was unsuited to a Flurkey/Menard style operation without prohibitively expensive renovations.[13] Burbank said that SNE would not reconsider Dos Anjos’s proposal in light of its disappointing experience with Flurkey and Menard. Burbank stressed his personal conviction that the Boch philosophy was in both SNE’s and Dos Anjos’s best interest. Burbank repeated the suggestion that Dos Anjos consider relocating or swapping the Chrysler and Subaru buildings. Dos Anjos objected to the first alternative as too costly, and the second as potentially unacceptable to Chrysler.[14] Burbank replied that SNE’s only recourse was non-renewal of Dos Anjos’s franchise.
24. On May 28, 1991, Burbank called Dos Anjos reiterating SNE’s rejection of the Flurkey/Menard option and strongly recommending that Dos Anjos accept one of the suggested alternatives. Dos Anjos refused.
25. On May 30, 1991, SNE sent Dos Anjos aformal notice of nonrenewal effective July 31, 1991. On June 6, 1991, Dos Anjos replied. He objected to SNE’s interpretation of the negotiations and expressed a desire to resolve their differences consistent with his February 12 proposal (that is, on a Flurkey/Menard basis).
26. Following this impasse, Dos Anjos arranged to meet privately with Boch. Boch professed sympathy with Dos Anjos’s financial problems and expressed a desire to continue their association. Boch suggested a one-year extension of the Blackstone franchise to permit further negotiations. On July 18, 1991, Dos Anjos wrote to Boch asking that SNE forward a one-year contract for review. On July 24, 1991, Burbank did so.
27. The one-year proposal was largely identical to the proposed 1991 contract. The planning volume figure was lowered to 160 units. The stipulation regarding space requirements mirrored the 1991 proposal rather than the language of the 1988 contract. Dos Anjos refused to sign and instead commenced this litigation.
28. Each year, 1979 through 1991, Dos Anjos’s Subaru franchise had been profitable. In 1989, net profits totaled $48,121; in 1990, $102,844. Retained earnings on an historical basis amounted to $668,000 by the end of 1990. By 1991, the franchise’s profitability had became increasingly dependent on parts and service as sales of new vehicles declined. Profits were bolstered in part, however, by a corresponding drop in operating costs. Blackstone employed the same number of people in 1990 as it did in 1985.
RULINGS OF LAW
In 1970, Massachusetts responded to allegations of abuse in the franchise relations of the automobile industry[15] by enacting chapter 93B of the General Laws.[16] The heart of that legislation, and the focus of this litigation, is §4(3)(e) of G.L.c. 93B, which prohibits an automobile manufacturer or distributor from failing or refusing to extend a franchise agreement without “good cause.”[17]
The negotiations between SNE and Dos Anjos foundered on two fundamental disagreements: (1) SNE’s refused to permit Dos Anjos the option of installing a second vehicle line in the Blackstone facility; and (2) Dos Anjos’s refusal to stipulate with SNE that the Blackstone facility, as deployed, was sufficient for Subaru purposes and no other. To SNE, exclusivity meant not only a dedicated staff but also a dedicated building. To Dos Anjos, it meant the former, but not necessarily the latter, or if it did, Dos Anjos believed that he could segregate competing dealerships in a way that would do no violence to SNE’s concept of exclusivity.[18] Massachusetts has yet to consider *246 whether, and under what circumstances, an automobile distributor may refuse to renew a dealer’s franchise where a dealer asks to be relieved of an exclusivity requirement. Compare Greater Lowell Auto Mall, Inc. v. Toyota Motor Distributors, Inc., 35 Mass.App.Ct. 246, 252 (1993) (distributor’s preference for free-standing car agencies a factor that could .be reasonably considered in refusing consent to an assignment of a franchise). Other jurisdictions that have considered the issue are split. Compare G.A. Imports, Inc. v. Subaru Mid-America, Inc., 799 F.2d 1200, 1208 (8th Cir. 1986) (holding that termination for failure to consent to an exclusivity provision is unfair where a manufacturer uses an exclusivity requirement to enhance market penetration, but cannot supply a sufficient number of vehicles), with Brattleboro Auto Sales v. Subaru of New England, 633 F.2d 649, 652 (2d Cir. 1980) (holding that good cause for termination existed where a distributor reasonably could have concluded that a dealer’s addition of three lines of directly competing makes in the same facility would be detrimental to its marketing interests).
A resolution of this issue is not necessary to a decision in this case.[19] Where termination results from a franchisor’s rejection of a franchisee’s proposal to modify the franchise agreement, a court should focus on whether the franchisor acted reasonably in withholding its consent. The franchisor’s good faith in insisting on what it perceives to be an essential term of the franchise agreement is a critical consideration in determining whether it acted with good cause. G.L.c. 93B, §4(1). See also Brattleboro Auto Sales, supra at 652.[20] Equally relevant is the franchisee’s reciprocal good faith in attempting to negotiate a modification of that same term. Cf. Warner Ins. Co. v. Commissioner of Ins., 406 Mass. 354, 362 n.9 (1990).
As to SNE’s good faith and commercial reasonableness in adhering to its exclusivity policy I have no doubts. The policy was not a recent contrivance intended to divest SNE of a dealer it considered undesirable. To the contrary, I believe that SNE was sincere in its desire to continue an association with Dos Anjos, albeit on its own terms. Exclusivity was a product of Boch’s experience, and a marketing concept that he attempted to apply uniformly and aggressively within his network of dealers. Boch attributed SNE’s success, with considerable empirical support, to the institution of a single-line sales strategy. Indeed, Dos Anjos had come to the same conclusion as Boch, and throughout the negotiations (and the trial) professed allegiance to the general precepts, if hot the particular application, of the concept.[21]
During the renewal negotiations, SNE presented Dos Anjos with two plausible alternatives to the requirement that the Seekonk facility be used exclusively for Subaru operations (swapping buildings and dualing the Chrysler franchise or constructing a smaller facility for Subaru). Either alternative would have allowed Dos Anjos to reduce his Subaru square footage while still satisfying SNE’s marketing philosophy. Dos Anjos had genuine objections to both alternatives, but rather than explore a compromise, chose to counterwith avague plan to reconfigure the existing Subaru facility into contiguous dealerships. SNE never received from Dos Anjos a proposal that adequately addressed its legitimate concern for preserving the integrity of its marketing strategy. SNE was within its rights to request such a proposal and under no obligation to give serious consideration to the improvised and inchoate proposal that Don Anjos grudgingly .submitted. SNE, in short, was never given a meaningful opportunity to reject an “exclusive contiguous” solution to Dos Anjos’s problems.[22] Cf. Adolph Coors Co. v. Rodriguez, 780 S.W.2d 477, 480 (Tex.App.1989) (where a prospective distributor never properly completed a purchase agreement and distributorship application, the manufacturer's failure to approve the sale cannot be fairly characterized as an unreasonable withholding of consent to the transfer of a franchise).
Dos Anjos may have calculated that his valued standing as a dealer (and his past success at wringing concessions from SIME) would force SNE into extending the franchise whether he was willing to negotiate seriously or not. If so, the bluff failed. SNE’s undisputed obligation to negotiate in good faith was never put to the test because of Dos Anjos’s failure to honor his reciprocal obligation to deal in good faith with SNE. I am also not unmindful of the fact that Dos Anjos was caught in a mess of his own making. He had chosen to build an emporium when SNE insisted on nothing more than a shop. SNE had no contractual or fiduciary obligation to rescue Dos Anjos by bailing him out of a retrospectively bad business judgment in which SNE had played no part.
Franchise provisions are unenforceable if they are inequitable, facially unreasonable, not rationally related to the maintenance of the franchise, or not comparable with those set by other manufacturers. Scuncio Motors, Inc. v. Subaru of New England, 555 F.Supp. 1121, 1136 (D.R.I. 1982), aff'd, 715 F.2d 10 (1st Cir. 1983). An exclusivity provision reserving space far exceeding that required by a manufacturer’s own standards in the mindless hope of increasing penetration of a resistant market might be ruled inequitable, irrational, and unreasonable.[23] See Tober Foreign Motors, Inc. v. Reiter Oldsmobile, Inc., 376 Mass. 313, 321 (1979); cf. G.A. Imports, Inc., supra 799 F.2d at 1207-08 (requiring dealer to maintain a single-line Subaru dealership to increase market penetration held unreasonable when distributor was unable to supply an adequate number of vehicles).[24] The Flurkey and Menard experience in and of itself might not have justified SNE in rejecting out-of-hand a serious proposal to reconfigure the Blackstone facility.[25] Cf. Bishay v. Foreign Motors, Inc.: Mercedes-Benz of North America, 416 Mass. 1, 9 n.17 (1993) (prior practices do not necessarily provide a measure for *247 gauging the reasonableness of a manufacturer’s prospective decisions). Compare Greater Lowell Auto Mall, Inc. v. Toyota Motor Distributors, Inc., supra, at 252 (“Given the history of failure [on a distributor’s part, Toyota] could resume adherence to its fundamental policy of avoid dualing and preferring freestanding car agencies”). It is to these principles that Dos Anjos resorts in his contention that “good cause” for the nonrenewal of a franchise requires a more substantial justification than simple commercial reasonableness. He urges the court to view the case from the perspective of his good faith in rejecting the 1991 proposed agreement as well as, or in lieu of, SNE’s good faith in refusing to renew the franchise. This is what I have done. It is precisely Dos Anjos’s bad faith approach to the negotiations — his unwillingness to give consideration to SNE’s suggested accommodations or to produce a serious counter-proposal, when contrasted with SNE’s good faith in seeking to protect a commercially reasonable marketing philosophy — that tips the balance in SNE’s favor.
Under the circumstances I rule that SNE had good cause to terminate Dos Anjos’s franchise.
ORDER
For the foregoing reason, judgment shall enter for the defendant Subaru of New England on all counts of the complaint.

 Blackstone presently operates the franchise under a temporary restraining order authorized by G.L.c. 93B, §4(3)(e)(3). The order has been several times extended by agreement of the parties.

 Dos Anjos also briefly invested in an ill-fated Yugo distributorship. Although the Yugo bombed in its Rhode Island debut, Blackstone carries a $550,000 loan to the defunct Yugo dealership as a book asset. Dos Anjos has historically operated all of his franchises as single-line dealerships.

 Subaru cars are manufactured by Fuji Heavy Industries. They are imported into the United States by Subaru of America, a captive subsidiary of Fuji. Subaru of America sells to thirteen independent regional distributors in the United States of which SNE (consisting of the six New England states) is one.

 Following the trial, SNE’s counsel notified the court that as of July 31, 1991, the number of dual dealers in SNE’s system was in fact eleven. Three dealers “de-dualed” after that date, two under court order and one by agreement. I have not stricken this testimony as it fits within the spirit of my ruling on the motion in limine permitting post-nonrenewal evidence reflecting on SNE’s good faith.

 Hemy Burbank, SNE’s Vice President of Market Development, testified that SNE dealers typically outperform other Subaru dealers in the U.S. by a factor of two or more. Burbank attributed this accomplishment to SNE’s exclusivity policy. SNE is the only Subaru regional distributor with such a policy.

 Planning volume is a term of art essentially reflecting Subaru’s expectation of a dealer’s penetration of an assigned marketing area as measured in new vehicle sales. Another term that figures in thé dispute is units of operation. It refers to the number of Subarus registered in the past five years in a dealer's market area, a rough measure of a dealer’s potential service pool.

 The first extension, granted on July 19, 1983, was specifically premised on Dos Anjos’s undertaking that the new facility was “to be provided exclusively for the promotion, sales and service of the Subaru product.” A second extension continued the completion date to August 1, 1984. A third postponed the deadline to October 31, 1984. SNE never refused a request by Dos Anjos for an extension.

 Subaru’s minimum standards for Dos Anjos’s projected planning volume envisioned a building of 11,905 square feet; Dos Anjos’s building contained 19,600 square feet. Subaru mandated a parts department of 1,300 square feet; Dos Anjos allotted 1,500 square feet. Subaru called for eleven service bays; Dos Anjos built fifteen, and so on. Dos Anjos explained that a larger prefabricated building was cheaper to erect, would provide space for future expansion, and would (he hoped) entice SNE into favoring him with a larger allocation of (then) scarce Subaru vehicles.

 Dos Anjos testified that he had no actual intention of dualing, but thought the threat might bluff SNE into raising his allowance of new cars.

 At least four other dealers had accepted similar suggestions from SNE.

 A correction in the calculation of Blackstone’s “share of [market] responsibility” caused a minor downward adjustment of the projected planning volume to 251 units.

 Both Dos Anjos and Burbank recalled that Burbank’s rejection of the Flurkey/Menard option came in a telephone call placed by Burbank the day after the February 12 meeting. The February 18 letter suggests otherwise.

 Burbank also pointed out to Dos Anjos that his architect’s plans did not contemplate dividing the existing building into self-contained units as both Flurkey and Men-ard had done.

 Dos Anjos conceded that had not discussed the issue with Chrysler prior to the May 8 meeting.

The hold that manufacturers and distributors have over dealers invites “a considerable array of oppressive practices.” See Tober Foreign Motors, Inc. v. Reiter Oldsmobile, Inc., 376 Mass. 313, 320 (1978).

 See Beard Motors, Inc. v. Toyota Motor Distributors, Inc., 395 Mass. 428, 432-33 (1985).

 G L.c. 93B, §4(3)(d), forbids any attempt to coerce a dealer into an agreement by threatening to cancel its franchise. As I indicated in my tentative rulings on defendant’s motion for an involuntary dismissal at the close of plaintiffs case, the evidence did not appear to warrant a finding that SNE had engaged in any coercive or threatening conduct. A review of my trial notes, the trial transcripts, and the exhibits confirms this conclusion. Consequently, I do not consider any claim of Blackstone that could be fairly characterized as alleging a violation of G.L.c. 93B, §4(3)(d).

 Prior to 1988, Dos Anjos had not strictly speaking committed himself to market only Subaru automobiles at the Seekonk facility. The November 21,1984, agreement provided only that Dos Anjos would dedicate certain minimum square footage of the building to Subaru operations. Joint Exhibit 11. See G.A. Imports, Inc. v. Subaru Mid-American, Inc., 799 F.2d 1200, 1206-07 (8th Cir. 1986); cf. American Isuzu Motors v. News Motor Vehicle Bd., 230 Cal.Rptr. 769, 775 (Cal.App.1986).
The 1988 franchise agreement similarly states that:
DEALER has agreed to conduct his Subaru dealership operation from a sales and service facility which at least meets SNE- Standards applicable to a dealer with a Planning Volume of 571 and Units and Operation of 1,711.
Joint Exhibit 12. An addendum to the 1988 agreement, however, added this language:
*248 DEALER and SNE have negotiated and agreed that all of the DEALER’S facility ... up to the minimum areas . . . will be devoted exclusively in support of DEALER’S Subaru franchise operations during the entire term of this Agreement; that the excess areas on DEALER’S facility shall be reserved for future expansion of DEALER’S Subaru franchise operation and pending such expansion ... shall not be utilized in support of any vehicle franchise operations other than Subaru . . .
See Joint Exhibit 12.The language SNE proposed forthe 1991 franchise toughened the 1988 contractual language further:
DEALER has agreed to conduct its exclusive Subaru dealership operation from a sales and service facility which at least complies with and may exceed SNE Standards applicable to a dealer with a Planning Volume of 252 and Units in Operation of 1723.
Joint Exhibit 17. The 1991 proposal retained the 1988 undertaking that excess space would be reserved solely for expansion of Subaru operations, while requiring Dos Anjos to stipulate further “that the [entire] facility ... is reasonably required for the proper sales and service functions associated with [his] exclusive Subaru dealership . . .” See Joint Exhibit 17.

 SNE contends that the law does not obligate it to tailor its marketing philosophy to what is “reasonable” given the circumstances of this particular dealer. Arguably, however, SNE had contractually imposed upon itself such a duty in the present case, whether or not such a duty is imposed by statute or common law. The franchise agreement drafted by SNE states that all of the space at the Seekonk facility is “reasonably" required to ensure that Blackstone Subaru properly discharges its sales and service obligations. See Joint Exhibit 17. If I were confronted only with the issue of whether SNE could terminate Dos Anjos’s franchise based upon Dos Anjos’s refusal to consent to this particular exclusivity provision, I would have to consider whether a total of 19,600 square feet of space is in fact “reasonably” necessary to meet a planning volume that had decreased from 571 units to 251 units and to service a pool of potential customer vehicles that had risen only marginally from 1,711 to 1,723 units.

 The “good cause” for termination requirement would seem satisfied on a showing by the distributor of objectively reasonable business grounds for its decision. See Foreign Motors, Inc. v. Audi of America, Inc., 755 F.Supp. 30, 34-35 (D.Mass. 1991). Blackstone does not argue that SNE’s insistence on exclusivity was objectively unreasonable. Indeed, Dos Anjos swore fidelity to the concept. “Good faith,” however, requires something more than commercial reasonableness, something on the order of subjective honesty in fact and purity of motive. The cases do not always clearly distinguish the two standards. See, e.g., Scuncio Motors, Inc. v. Subaru of New England, Inc., 555 F.Supp. 1121, 1132 (D.R.I. 1982), aff'd, 715 F.2d 10 (1st Cir. 1983).

 Conflicts in marketing philosophy alone would not appear a sufficient reason for a franchisor to terminate a franchise agreement. See, e.g., State Distributors, Inc. v. Glenmore Distilleries, 738 F.2d 405, 413-14 (10th Cir. 1984) (where franchisee consistently failed to meet sales expectations, failed to improve performance, failed to adequately represent the product, and followed a market approach contrary to the franchisor’s preferred approach, Federal Dealer - Day-in-Court Act will allow termination of franchise as necessary to protect the survival of the business and the franchisor’s investment). See also Foreign Motors, Inc. v. Audi of America, Inc., 755 F.Supp. 30, 35 (D.Mass. 1991) (G.L.c. 93B does not purport to shield chronically and irremediably poor performing dealers “from adverse decisions formulated on legitimate business and economic grounds”). The guidelines set out in §4 of G .L. c. 93B for determining whether “good cause” to terminate a franchise agreement exists are of little assistance. In contrast to the hapless dealer who figures in the more typical case upholding the termination of a franchise, Dos Anjos was a profitable dealer who did not breach his franchise agreement.

 SNE’s counsel candidly conceded at oral argument that there is no evidence that SNE, had it been presented a set of plans for an actual “exclusive contiguous” reconfiguration of the Subaru building, would have approved them. The court is not required to speculate on the consequences had SNE refused to give serious consideration to such a proposal. See footnote 19, supra

 There is support for the proposition that franchisors must take a flexible approach to marketing in the face of adverse market conditions. Cf. Little Oil Co., Inc. v. Atlantic Richfield Co., 852 F.2d 441, 445 (9th Cir. 1988) (the legislative history of the Petroleum Marketing Practices Act recognizes the need of franchisors to change their marketing activities “to respond to changing market conditions and consumer preferences”).

 Termination of a profitable dealer solely for failing to further penetrate an assigned market is unlikely to be supported by “good cause.” Cf. Chrysler Motors v. Neb. Motor Veh. Industry, 274 N.W.2d 862, 863-64 (Neb. 1979) (where present facilities are competitive and adequate for dealer’s volume and the Nebraska statute prohibits termination based upon franchisor’s desire to further expand a dealer’s market, a dealer’s refusal to physically expand his facility will not provide good cause for termination).

 G L.c. 93B does not prohibit dealers from establishing multiple franchise affiliations. See G.L.c. 93B, §7 (distributor prohibited from imposing upon dealer unreasonable restrictions concerning non-competition covenants and site-control); cf. Kawasaki Shop v. Kawasaki Motors Corp., 544 N.E.2d 457, 463 n. 11 (Ill.App.1989) (implicit in Illinois Dealer Day-in-Court Act is the understanding that a dealer cannot be terminated simply because of multiple affiliations).